LEROY, ATTORNEY GENERAL OF IDAHO, ET AL. *v.*
GREAT WESTERN UNITED CORP.

No. 78–759.  Argued April 17, 1979—Decided June 26, 1979

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 187.

*Peter E. Heiser, Jr.,* Special Deputy Attorney General of Idaho, argued the cause and filed briefs for appellants.

*Ivan Irwin, Jr.,* argued the cause for appellee. With him on the brief were *A. B. Conant, Jr.,* and *James William Moore.*

*Amy Juviler,* Assistant Attorney General, argued the cause for the State of New York et al. as *amici curiae* urging reversal. With her on the brief were *Robert Abrams,* Attorney General, and *Shirley Adelson Siegel,* Solicitor General.

*Deputy Solicitor General Easterbrook* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General McCree, Elinor Hadley Stillman,* and *Ralph C. Ferrara.*[*]

---

[*]Briefs of *amici curiae* urging reversal were filed by *George Deukmejian,* Attorney General of California, *Arthur C. DeGoede,* Assistant Attorney General, and *Philip C. Griffin* and *Ronald V. Thunen, Jr.,* Deputy Attorneys General; *Michael T. Greely,* Attorney General of Montana; *Rufus L. Edmisten,* Attorney General of North Carolina, and *Rudolph A. Ashton III,* Assistant Attorney General; and *N. Jerome Diamond,* Attorney General of Vermont, for the States of California et al.; by *Theodore L. Sendak,* At-

MR. JUSTICE STEVENS delivered the opinion of the Court.

An Idaho statute imposes restrictions on certain purchasers of stock in corporations having substantial assets in Idaho. The questions presented by this appeal are whether the state agents responsible for enforcing the statute may be required to defend its constitutionality in a Federal District Court in Texas and, if so, whether the statute conflicts with the Williams Act amendments to the Securities Exchange Act of 1934,[1] or with the Commerce Clause of the United States Constitution.[2]

Sunshine Mining and Metal Co. (Sunshine) is a "target company" within the meaning of the Idaho Corporate Take-over Act—a statute designed to regulate takeovers of corporations that have certain connections to the State.[3] Sunshine's principal business is a silver mining operation in the Coeur

torney General, *William G. Mundy,* Assistant Attorney General, and *Donald P. Bogard* for the State of Indiana; by *Francis X. Bellotti,* Attorney General, and *William M. O'Brien,* Special Assistant Attorney General, for the Commonwealth of Massachusetts; by *William J. Brown,* Attorney General, and *Donald A. Antrim,* Special Assistant Attorney General, for the State of Ohio; by *Robert B. Hansen,* Attorney General, *Michael L. Deamer,* Chief Deputy Attorney General, and *Donald B. Holbrook* for the State of Utah; and by *Jon S. Hanson* and *Richard A. Hemmings* for the National Association of Insurance Commissioners.

[1] 82 Stat. 454; see 15 U. S. C. §§ 78m (d), 78m (e), 78n (d)–78n (f).

[2] "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes. . . ." U. S. Const., Art. I, § 8.

[3] Chapter 15 of Title 30 of the Idaho Code is entitled "Corporate Takeovers." Its opening provision contains the following definition:

" 'Target company' means a corporation or other issuer of securities which is organized under the laws of this state or has its principal office in this state, *which has substantial assets located in this state,* whose equity securities of any class are or have been registered under chapter 14, title 30, Idaho Code, or predecessor laws or section 12 of the Securities Exchange Act of 1934, and which is or may be involved in a take-over offer relating to any class of its equity securities." Idaho Code § 30–1501 (6) (Supp. 1979) (emphasis added).

d'Alene Mining District in Idaho. Its executive offices and most of its assets are located in the State. Sunshine is also engaged in business in New York and, through a subsidiary, in Maryland. Its stock is traded over the New York Stock Exchange, and its shareholders are dispersed throughout the country. App. 36. It is a Washington corporation. *Great Western United Corp.* v. *Kidwell,* 439 F. Supp. 420, 423–424.

Great Western United Corp. (Great Western) is an "offeror" within the meaning of the Idaho statute.[4] Great Western is a publicly owned Delaware corporation with executive headquarters in Dallas, Tex., and corporate offices in Denver, Colo. App. 131. In early 1977, Great Western decided to make a public offer to purchase 2 million shares of Sunshine stock for a premium price. Because consummation of the proposed tender offer would cause Great Western to own more than 5% of Sunshine's outstanding shares, Great Western was required to comply with certain provisions of the Williams Act and arguably also to comply with the Idaho Corporate Takeover Act as well as with similar provisions of New York and Maryland.

On March 21, 1977, Great Western publicly announced its intent to make a tender offer for 2 million shares of Sunshine, and its representatives took simultaneous steps to implement the proposed tender offer. They filed a Schedule 13D with the Securities and Exchange Commission in Washington, D. C.,

---

[4] " 'Offeror' means a person who makes or in any way participates in making a take-over offer, and includes all affiliates and associates of that person, and all persons acting jointly or in concert for the purpose of acquiring, holding or disposing of or exercising any voting rights attached to the equity securities for which a take-over offer is made.

.          .          .          .          .

" 'Take-over offer' means the offer to acquire or the acquisition of any equity security of a target company, pursuant to a tender offer or request or invitation for tenders, if after the acquisition thereof the offeror would be directly or indirectly a beneficial owner of more than five per cent (5%) of any class of the outstanding equity securities of the issuer." §§ 30–1501 (3), (5) (Supp. 1979).

disclosing the information required by the Williams Act. They consulted with state officials in Idaho, New York, and Maryland about compliance with the corporate takeover laws of those States. And they filed documents with the Idaho Director of Finance in an attempt to satisfy Idaho's statute.

On March 25, 1977, Melvin Baptie, who was then the Deputy Administrator of Securities of the Idaho Department of Finance, sent a telecopy letter of objections to Great Western's filing to the company's offices in Dallas. The letter stated that certain pages of Great Western's SEC Form 13D were missing, asked for several additional items of information, and indicated that no hearing would be scheduled, nor other action taken, until all of the requested information had been received. App. to Juris. Statement A–156 to A–164. On the same day, Tom McEldowney, the Director of Finance of Idaho, entered an order delaying the effective date of the tender offer. Id., at A–165 to A–166. Great Western made no response to Baptie's letter or to McEldowney's order.

On March 28, 1977, Great Western filed this action in the United States District Court for the Northern District of Texas, naming as defendants the state officials responsible for enforcing the Idaho, New York, and Maryland takeover laws. The complaint prayed for a declaration that the state laws were invalid insofar as they purported to apply to interstate cash tender offers to purchase securities traded on the national exchange. App. 1–36. The claims against the Maryland and New York defendants were dismissed because the former did not attempt to enforce their statute against Great Western and the latter expressly stated that they would not assert jurisdiction over the proposed tender offer. 439 F. Supp., at 428–429. The two Idaho defendants—McEldowney, the Director of Finance, and Wayne Kidwell, then Attorney General of the State [5]—appeared specially to contest jurisdiction and

---

[5] Baptie, who wrote the letter of comment on March 25, 1977, was not named as a defendant. David H. Leroy has now replaced Kidwell as Attorney General of the State.

venue, and later filed an answer contesting the merits of the claim.

The District Court found four separate statutory bases for federal jurisdiction.[6] It held that personal jurisdiction over the Idaho defendants had been obtained by service pursuant to the Texas long-arm statute.[7] It concluded, however, that venue was improper under the general federal venue statute, 28 U. S. C. § 1391 (b),[8] because the defendants obviously did not reside in Texas and the claim arose in Idaho rather than in Texas. Nonetheless, it decided that venue could be sustained under the special venue provision in § 27 of the Securities Exchange Act of 1934 (1934 Act). 48 Stat. 902, as amended, 15 U. S. C. § 78aa. See nn. 9 and 10, *infra,* and accompanying text.

On the merits, the District Court held that the Idaho Corporate Takeover Act is pre-empted by the Williams Act and places an impermissible burden on interstate commerce. It granted injunctive relief that enabled Great Western to acquire the desired Sunshine shares in the fall of 1977. 439 F. Supp., at 434–440. That acquisition did not moot the case, however, because the question whether Great Western has violated Idaho's statute will remain open unless and until the District Court's judgment is finally affirmed.

A divided panel of the Court of Appeals for the Fifth Circuit affirmed. The court sustained federal subject-matter

---

[6] "The Court has subject matter jurisdiction over this case on four bases: 28 U. S. C. § 1331 (general federal question), 28 U. S. C. § 1332 (diversity), 28 U. S. C. § 1337 (acts affecting commerce) and Section 27 of the [Securities Exchange Act of 1934, 15 U. S. C. § 78aa]." 439 F. Supp., at 430.

[7] Tex. Rev. Civ. Stat. Ann., Art. 2031b (Vernon 1964).

[8] Section 1391 (b) provides:

"A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law."

jurisdiction on the same four grounds relied upon by the District Court. See n. 6, *supra*. It then advanced alternative theories in support of both its determination that the District Court had personal jurisdiction over the defendants and its conclusion that venue lay in the Northern District of Texas. First, it noted that the Texas long-arm statute authorized the assertion of personal jurisdiction over nonresidents to the fullest extent allowable under the Due Process Clause of the Fourteenth Amendment. It then held that an Idaho official who seeks to enforce an Idaho statute to prevent a Texas-based corporation from proceeding with a national tender offer has sufficient contacts with Texas to support jurisdiction. Second, it held that jurisdiction was available under § 27 of the 1934 Act,[9] which gives the federal district courts exclusive jurisdiction over suits brought "to enforce any . . . duty created" by the Act. It based this holding on the theory that Idaho's enforcement attempts, by conflicting with the Williams Act, constituted a violation of a "duty" imposed by § 28 (a) of the 1934 Act.[10] It relied on the same reasoning to sup-

---

[9] "The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity or actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found. . . ." 15 U. S. C. § 78aa.

[10] Section 28 (a), as set forth in 15 U. S. C. § 78bb (a), provides in pertinent part:

"Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder."

port its conclusion that venue was authorized by § 27 of the 1934 Act. Finally, disagreeing with the District Court, the Court of Appeals concluded that venue in the Northern District of Texas was also proper under the general federal venue provision, 28 U. S. C. § 1391 (b), because the allegedly invalid restraint against Great Western occurred there and it was accordingly "the judicial district . . . in which the claim arose." *Great Western United Corp.* v. *Kidwell,* 577 F. 2d 1256, 1265–1274. On the merits, the Court of Appeals agreed with the analysis of the District Court. *Id.,* at 1274–1287.

We noted probable jurisdiction of the appeal. 439 U. S. 1065. Without reaching either the merits or the constitutional question arising out of the attempt to assert personal jurisdiction over appellants, we now reverse because venue did not lie in the Northern District of Texas.

## I

The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum. See generally C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3801, pp. 5–6 (1976) (hereinafter Wright, Miller, & Cooper). On the other hand, neither personal jurisdiction nor venue is fundamentally preliminary in the sense that subject-matter jurisdiction is, for both are personal privileges of the defendant, rather than absolute strictures on the court, and both may be waived by the parties. See *Olberding* v. *Illinois Central R. Co.,* 346 U. S. 338, 340; *Neirbo Co.* v. *Bethlehem Corp.,* 308 U. S. 165, 167–168. Accordingly, when there is a sound prudential justification for doing so, we conclude that a court may reverse the normal order of considering personal jurisdiction and venue.

Such a justification exists in this case. Although for the reasons discussed in Part II, *infra,* it is clear that § 27 of the 1934 Act does not provide a basis for personal jurisdiction, the

question whether personal jurisdiction was properly obtained pursuant to the Texas long-arm statute is more difficult. Indeed, because the Texas Supreme Court has construed its statute as authorizing the exercise of jurisdiction over non-residents to the fullest extent permitted by the United States Constitution,[11] resolution of this question would require the Court to decide a question of constitutional law that it has not heretofore decided. As a prudential matter it is our practice to avoid the unnecessary decision of novel constitutional questions. We find it appropriate to pretermit the constitutional issue in this case because it is so clear that venue was improper either under § 27 of the 1934 Act or under § 1391 (b) of the Judicial Code.

## II

The linchpin of Great Western's argument that venue is provided by § 27 of the 1934 Act is its interpretation of § 28 (a) of that Act. See nn. 9, 10, *supra.* It reads § 28 (a) as imposing an affirmative "duty" on the State of Idaho, the violation of which may be redressed in the federal courts under § 27. As Mr. Justice Frankfurter said of a similar argument in a similar case, however, "[t]his is a horse soon curried." *Olberding, supra,* at 340.

The reference in § 27 to the "liabilit[ies] or dut[ies] created by this chapter" clearly corresponds to the various provisions in the 1934 Act that explicitly establish duties for certain participants in the securities market or that subject such persons

---

[11] *E. g., U-Anchor Advertising, Inc.* v. *Burt,* 553 S. W. 2d 760 (Tex. 1977). Appellants argue that this construction is only applicable to private commercial defendants and should not govern either in a suit against the agents of another sovereign State or in one against persons who are not engaged in commercial endeavors. Both the District Court and the Court of Appeals, however, have concluded that the statute does extend to the limits of the Due Process Clause in this case, and it is not our practice to re-examine state-law determinations of this kind. *E. g., Butner* v. *United States,* 440 U. S. 48, 57–58; *Bishop* v. *Wood,* 426 U. S. 341, 345–346, and n. 8; *Propper* v. *Clark,* 337 U. S. 472, 486–487.

to possible actions brought by the Government, the Securities and Exchange Commission, or private litigants.[12] Section 28 (a) is not such a provision. There is nothing in its text or its legislative history to suggest that it imposes any duty on the States or that indicates who might enforce any such duty. The section was plainly intended to protect, rather than to limit, state authority.[13] Because § 28 (a) imposed no duty on appellants, the argument that § 27 establishes venue in the District Court is unsupportable.[14]

---

[12] *E. g.,* § 14 (a) of the 1934 Act, 15 U. S. C. § 78n (a) ("It shall be *unlawful* for any person . . . to solicit any proxy . . . in contravention of such rules and regulations as the Commission may prescribe . . .") (emphasis added); § 16 (b), 15 U. S. C. § 78p (b) ("For the purpose of preventing the unfair use of information which may have been obtained by [the] beneficial owner [of 10% of any class of equity security], director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, *shall inure to and be recoverable by the issuer* . . .") (emphasis added); § 17 (a) (1), as set forth in 15 U. S. C. § 78q (a) (1) ("Every national securities exchange, member thereof, broker or dealer who transacts a business in securities through the medium of any such member, registered securities association, registered broker or dealer, registered municipal securities dealer, registered securities information processor, registered transfer agent, and registered clearing agency . . . *shall* make and keep . . . such records . . . and make . . . such reports as the Commission, by rule, prescribes . . .") (emphasis added).

[13] Thomas Corcoran, a principal draftsman of the 1934 Act, indicated to Congress that the purpose of § 28 (a) was to leave the States with as much leeway to regulate securities transactions as the Supremacy Clause would allow them in the absence of such a provision. Hearings on S. Res. 84 (72d Cong.), 56, and 97 (73d Cong.) before the Senate Committee on Banking and Currency, 73d Cong., 1st Sess., 6577 (1934). In particular, the provision was designed to save state blue-sky laws from preemption. See *ibid.*

[14] When one considers the straightforward language of §§ 27 and 28 (a), it is difficult to regard MR. JUSTICE WHITE's ingenuous and intricate argu-

## III

Nor, as the District Court correctly concluded, is venue available under § 1391 (b). The first test of venue under that provision—the residence of the defendants—obviously points to Idaho rather than Texas. The Court of Appeals reasoned, however, under the second relevant test that the claim arose in Dallas because that is the place where the Idaho officials "invalidly prevented Great Western from initiating a tender offer for Sunshine." 577 F. 2d, at 1273.[15] The court buttressed its conclusion by noting that a single action against the officials of New York, Maryland, and Idaho could not have been instituted in any one place unless the claim was treated as having arisen in Dallas. *Ibid.*

The easiest answer to this latter argument is that Great Western's complaint did not in fact raise justiciable claims against any officials save those in Idaho. But that is not the only answer. Although the legal issues raised in the complaint challenging the constitutionality of the statutes of three different States were similar, and the convenience of Great Western would obviously be served by consolidating the three claims for trial in one district, the general venue statute does not authorize the plaintiff to rely on either of those reasons to justify its choice of forum.

In most instances, the purpose of statutorily specified venue

---

ment as a realistic reflection of the actual intent of the legislators who enacted these provisions.

Nor is the breadth of the venue created by § 27, see *post,* at 188–189, citing *Ritter* v. *Zuspan,* 451 F. Supp. 926, 928 (ED Mich. 1978), a sufficient reason for assuming that that section, rather than some narrower venue provision, applies whenever a suit involves the 1934 Act. See *Radzanower* v. *Touche Ross & Co.,* 426 U. S. 148.

[15] The Court of Appeals properly concluded that the determination of where "the claim arose" for purposes of federal venue under § 1391 is a federal question whose answer depends on federal law. See cases cited in 1 J. Moore, Federal Practice ¶ 0.142 [5.–2], pp. 1429–1430 (1979); Wright, Miller, & Cooper § 3803, pp. 10–13.

is to protect the *defendant* against the risk that a plaintiff will
select an unfair or inconvenient place of trial.[16] For that
reason, Congress has generally not made the residence of the
plaintiff a basis for venue in nondiversity cases. But cf. 28
U. S. C. § 1391 (e). The desirability of consolidating similar
claims in a single proceeding may lead defendants, such per-
haps as the New York and Maryland officials in this case, to
waive valid objections to otherwise improper venue. But
that concern does not justify reading the statute to give the
plaintiff the right to select the place of trial that best suits his
convenience. So long as the plain language of the statute
does not open the severe type of "venue gap" that the amend-
ment giving plaintiffs the right to proceed in the district where
the claim arose was designed to close,[17] there is no reason to
read it more broadly on behalf of plaintiffs.[18]

Moreover, the plain language of § 1391 (b) will not bear
the Court of Appeals' interpretation. The statute allows
venue in "the judicial district . . . in which the claim arose."
Without deciding whether this language adopts the occa-

---

[16] See *Braden* v. *30th Judicial Circuit Court of Ky.*, 410 U. S. 484, 493–
494; *Denver & R. G. W. R. Co.* v. *Railroad Trainmen*, 387 U. S. 556, 560;
*Neirbo Co.* v. *Bethlehem Corp.*, 308 U. S. 165, 168; *Reuben H. Donnelley
Corp.* v. *FTC*, 580 F. 2d 264, 269 (CA7 1978).

[17] See *Brunette Machine Works* v. *Kockum Industries*, 406 U. S. 706,
710, and n. 8. As *Brunette* indicates, the amendment of § 1391 to provide
for venue where the claim arose was designed to close the "venue gaps"
that existed under earlier versions of the statute in situations in which
joint tortfeasors, or other multiple defendants who contributed to a single
injurious act, could not be sued jointly because they resided in different
districts. 406 U. S., at 710 n. 8. In this case, by contrast, Great Western
has attempted to join in one suit three separate claims—each challenging a
different statute—against three sets of defendants from three States. The
statute simply does not contemplate such a choice on the part of plaintiffs.

[18] "The requirement of venue is specific and unambiguous; it is not one
of those vague principles which, in the interest of some overriding policy,
is to be given a 'liberal' construction." *Olberding* v. *Illinois Central R.
Co.*, 346 U. S. 338, 340.

sionally fictive assumption that a claim may arise in only one district,[19] it is absolutely clear that Congress did not intend to provide for venue at the residence of the plaintiff or to give that party an unfettered choice among a host of different districts. *Denver & R. G. W. R. Co.* v. *Railroad Trainmen,* 387 U. S. 556, 560. Rather, it restricted venue either to the residence of the defendants or to "a place which may be more convenient to the litigants"—*i. e.,* both of them—"or to the witnesses who are to testify in the case." S. Rep. No. 1752, 89th Cong., 2d Sess., 3 (1966). See *Denver & R. G. W. R. Co., supra,* at 560. See also *Brunette Machine Works* v. *Kockum Industries,* 406 U. S. 706, 710. In our view, therefore, the broadest interpretation of the language of § 1391 (b) that is even arguably acceptable is that in the unusual case in which it is not clear that the claim arose in only one specific district,[20] a plaintiff may choose between those two (or conceivably even more) districts that with approximately equal plausibility—in terms of the availability of witnesses, the accessibility of other relevant evidence, and the convenience of the defendant (but *not* of the plaintiff)—may be assigned as the locus of the claim. Cf. *Braden* v. *30th Judicial Circuit Court of Ky.,* 410 U. S. 484, 493–494.

This case is not, however, unusual. For the claim involved has only one obvious locus—the District of Idaho. Most importantly, it is action that was taken in Idaho by Idaho residents—the enactment of the statute by the legislature, the review of Great Western's filing, the forwarding of the comment letter by Deputy Administrator Baptie, and the entry of the order postponing the effective date of the tender by Finance Director McEldowney—as well as the future action that may be taken in the State by its officials to punish

---

[19] The two sides of this question, and the cases supporting each, are discussed in 1 Moore, *supra* n. 15, at ¶ 0.142 [5.–2], pp. 1426–1435; Wright, Miller, & Cooper § 3806, pp. 28–34.

[20] See ALI, Study of Division of Jurisdiction Between State and Federal Courts, Commentary 136–137 (1969).

.

or to remedy any violation of its law, that provides the basis for Great Western's federal claim. For this reason, the bulk of the relevant evidence and witnesses—apart from employees of the plaintiff, and securities experts who come from all over the United States [21]—is also located in the State. Less important, but nonetheless relevant, the nature of this action challenging the constitutionality of a state statute makes venue in the District of Idaho appropriate. The merits of Great Western's claims may well depend on a proper interpretation of the State's statute, and federal judges sitting in Idaho are better qualified to construe Idaho law, and to assess the character of Idaho's probable enforcement of that law, than are judges sitting elsewhere. See cases cited in n. 11, *supra*.

We therefore reject the Court of Appeals' reasoning that the "claim arose" in Dallas because that is where Great Western proposed to initiate its tender offer, and that is where Idaho's statute had its impact on Great Western. Aside from the fact that these "contacts" between the "claim" and the Texas District fall far short of those connecting the claim and the Idaho District, we note that this reasoning would subject the Idaho officials to suit in almost every district in the country. For every prospective offeree—be he in New York, Los Angeles, Miami, or elsewhere, rather than in Dallas—could argue with equal force (or Great Western could argue on his behalf) that he had intended to direct his local broker to accept the tender and was frustrated in that desire by the Idaho law.[22] As we noted above, however, such a reading of § 1391 (b) is inconsistent with the underlying purpose of the provision, for it would leave the venue decision entirely in the hands of plaintiffs, rather than making it "primarily a matter

---

[21] At the trial held in the Northern District of Texas, the witness roster, in addition to various Idaho officials and Great Western employees from Dallas, mainly included experts from the New York area as well as one each from California, Maryland, Texas, and Wisconsin. App. 100–292.

[22] Sunshine's shareholders are located in 49 States as well as the District of Columbia and Puerto Rico. *Id.*, at 36.

of convenience of litigants and witnesses." *Denver & R. G. W. R. Co., supra,* at 560.[23] In short, the District of Idaho is the only one in which "the claim arose" within the meaning of § 1391 (b).

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

When Great Western proposed in Dallas, Tex., to make a cash tender offer for up to two million shares of Sunshine, officials in Idaho, Maryland, and New York indicated that the offer would be subject to the corporate takeover statute of each State. Having complied with the provisions of the Williams Act governing tender offers and believing that extraterritorial application of the additional requirements of the state statutes was pre-empted by and in conflict with the federal statute, Great Western brought suit in Federal District Court for the Northern District of Texas for declaratory and injunctive relief against enforcement of the state statutes. Because I conclude that venue in that District and personal jurisdiction over the defendant state officials were authorized by § 27 of the Securities Exchange Act of 1934, 15 U. S. C. § 78aa, I disagree with the Court's disposition of this appeal and would reach the merits of Great Western's contention that Idaho's statute is pre-empted by the Williams Act.

I

The Williams Act was enacted in the form of a set of amendments to the Securities Exchange Act, which, like the

---

[23] In *Denver & R. G. W. R. Co.,* the Court concluded that the drafters of § 1391 (b) did not intend to provide venue in suits against unincorporated associations in every district in which a member of the association resided. To do so, it noted, would give the plaintiff an unrestrained choice of venues and would accordingly be "patently unfair" to the defendant. 387 U. S., at 560. A like reasoning is controlling here.

Securities Act of 1933, contains its own venue provision. Section 27 prescribes two separate requirements—one relating to the attributes of the judicial district in which suit is brought, and the second relating to the nature of the suit. I consider these in turn.

A

Comparison of the terms of § 27 with the terms of the general federal venue statute, 28 U. S. C. § 1391 (b), shows the relative ease with which venue may be obtained in suits brought under the Securities Exchange Act. Whereas under § 1391 (b) venue is proper only in a judicial district that is either where (a) the defendant(s) reside, or (b) "the claim arose," under § 27 suit may be brought in any district that is either where (a) the defendant may be found, is an inhabitant, or transacts business, or (b) "any act or transaction constituting the violation occurred." As the majority notes, some courts have been reluctant to embrace the view that a claim may arise in more than one district for purposes of § 1391 (b). On the other hand, it has been widely accepted that there may be more than one district where acts constituting a violation may occur for purposes of § 27, and indeed that the act on which venue is predicated need be only a "material" part of an alleged violation of the Securities Exchange Act.[1] "Without question, the intent of the venue . . . provisions of the securities laws is to grant potential plaintiffs liberal choice in their selection of a forum." *Ritter* v. *Zuspan*, 451 F. Supp. 926, 928 (ED Mich. 1978). Given the underlying policy of § 27 to confer venue in a wide variety of districts in order to ease the task of enforcement of federal securities law, it would be anomalous indeed if venue were not available in the North-

---

[1] See *Puma* v. *Marriott*, 294 F. Supp. 1116, 1120 (Del. 1969); *Prettner* v. *Aston*, 339 F. Supp. 273 (Del. 1972); *Mayer* v. *Development Corp. of America*, 396 F. Supp. 917, 928–930 (Del. 1975). See also *Black & Co.* v. *Nova-Tech, Inc.*, 333 F. Supp. 468 (Ore. 1971).

ern District of Texas in this case. Faced with the alternative left to it by the majority—of instituting separate suits in each State attempting to apply its extraterritorial takeover law, or perhaps waiting and defending separate enforcement actions brought by each State—Great Western might well choose to forgo its tender offer altogether, a result not in keeping with the purposes of the Williams Act or § 27. Although in this case only three States indicated an intention to assert jurisdiction over the tender offer, and only Idaho ultimately attempted to enforce its statute, it is important to note that there are analogous statutes in a total of 36 States.[2]

With the foregoing in mind, even if the claim in this case did not arise in Dallas within the meaning of § 1391 (b), Dallas is a place where an act constituting an alleged violation of the Williams Act occurred, because it is where appellants sought to apply Idaho's statute. Of course, for purposes of determining whether venue requirements were met, the substantive allegations of Great Western's claim—that is, that Idaho's statute conflicts with the Williams Act—must be accepted as true. The specific act alleged to violate a duty created by the Williams Act is the application of the Idaho statute to the Dallas tender offer. The gist of the act complained of being extraterritorial application of Idaho's statute, this act obviously occurs not only in Idaho but also in the district where the extraterritorial tender offer is made.

## B

Having determined that the Northern District of Texas has the required relationship to the claim in this case, venue in that District was proper under § 27 as long as the second general requirement of the provision was met; that is, if it may be said that Great Western's suit was "to enforce any liability

---

[2] See Note, Securities Law and the Constitution: State Tender Offer Statutes Reconsidered, 88 Yale L. J. 510, 514–515, n. 29 (1979).

or duty created by this chapter . . . , or to enjoin any violation of such chapter . . . ." In the majority's view, the term "duty created by this chapter" means only those duties "explicitly" prescribed by a provision of the Williams Act. *Ante,* at 181–182. The majority would further restrict the term to refer only to duties imposed on "participants in the securities market," *ante,* at 181, which presumably does not include officials seeking to enforce state corporate takeover laws.

But § 27 does not provide that the duty must be "explicitly" stated in a provision of the Williams Act or that only "participants in the securities market" have duties under the Act. Rather, it broadly encompasses all suits to enforce "any . . . duty created by" the Act. Here respondent sought an injunction against enforcement of Idaho's statute as applied to its interstate tender offer, on the ground that such enforcement is pre-empted by and in conflict with the Williams Act. The only question, then, is whether the Williams Act imposes on state officials, expressly or impliedly, the duty not to enact or enforce legislation inconsistent therewith. In my view, the answer to this question must be in the affirmative. The Supremacy Clause of the Constitution provides that if state law conflicts with federal law, federal law prevails. Given this command, the very enactment and existence of the Williams Act pre-empts and invalidates all conflicting state efforts to regulate cash tender offers. Viewed from the perspective of potential offerors, the existence of the Act creates the right not to be subject to conflicting state regulation. Viewed from the perspective of state officials, the existence of the Act creates a duty not to undertake conflicting regulation efforts.

That the duty alleged to have been violated in this case would not exist in the absence of the Supremacy Clause does not make the duty any less a creation of the Williams Act. "[A]ll federal actions to enjoin a state enactment rest ultimately on the Supremacy Clause," *Swift & Co.* v. *Wickham,* 382 U. S. 111, 126 (1965), whether the substantive federal

law relied upon be a statute—as in *Swift* [3] and as in this case—or another provision of the Constitution, such as the Commerce Clause. Thus, the command of the Supremacy Clause is necessary to the authoritative assertion of any federal right or counterpart duty, and imposes the general duty not to act in a manner inconsistent with federal law. However, the specific duty alleged to have been violated in this case—not to enforce extraterritorial state takeover laws such as Idaho's—is imposed by the existence of pre-emptive federal regulation.[4] Just as various provisions of the Williams Act create certain duties on the part of participants in the securities market, the Williams Act as a whole creates the duty on the part of state officials not to regulate in a manner inconsistent with that Act.

## II

Once it is determined that § 27 contemplates venue for Great Western's claim in the Northern District of Texas, the federal court in that District also had personal jurisdiction over the Idaho defendants, they having been served in a "district . . . wher[e] . . . found," there being no objection to the

---

[3] A claim of pre-emption is based on an alleged violation of a federal statute. In *Swift*, appellants—poultry packing companies—alleged that "enforcement [of a New York statute's labeling requirements] would violate the . . . overriding requirements of [a federal labeling statute]." 382 U. S., at 114. Similarly, state welfare practices may be challenged on the ground that they conflict with the Social Security Act, see, e. g., *Edelman* v. *Jordan*, 415 U. S. 651, 675 (1974); *Hagans* v. *Lavine*, 415 U. S. 528 (1974); *King* v. *Smith*, 392 U. S. 309, 312 n. 3 (1968).

[4] The Court of Appeals concluded that appellants' duty was created by § 28 (a) of the Securities Exchange Act of 1934, 15 U. S. C. § 78bb (a). See *Great Western United Corp.* v. *Kidwell*, 577 F. 2d 1256, 1271–1272 (CA5 1978). However, the duty not to act in a manner inconsistent with the Williams Act would exist even without § 28 (a). Of course, that provision may be relevant in considering the merits of Great Western's claim of pre-emption, in that it may shed light on the nature and scope of state regulation of tender offers that would not be in conflict with the Williams Act.

manner of service of process, and there being no restrictions imposed by the Constitution on the exercise of jurisdiction by the United States over its residents, see *Fitzsimmons* v. *Barton,* 589 F. 2d 330 (CA7 1979).[5]

---

[5] Appellants also raise the issue whether a tender offeror has a cause of action "under the Williams Act amendments to the Securities Exchange Act of 1934 to challenge the constitutionality of state corporate takeover laws." Juris. Statement 4. In *Piper* v. *Chris-Craft Industries, Inc.,* 430 U. S. 1, 47 n. 33 (1977), we left open the question "whether as a general proposition a suit in equity for injunctive relief . . . would lie in favor of a tender offeror" under an antifraud provision of the Williams Act. See also *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 577 (1979), rejecting the notion that § 27 of the Securities Exchange Act of 1934 creates any implied cause of action. However, the complaint alleged a cause of action not only under the Williams Act and § 27, but also under 42 U. S. C. § 1983, see App. 3–4, 13, which applies in suits against state officials. Because the pre-emption claim alleges deprivation of a right secured by a federal statute, see Part I–B of text, *supra,* it states a cause of action under the "and laws" provision of § 1983.