708 A.2d 1038

**Michael A. KANE, Trustee et al.**

v.

**G. Stephen SCHULMEYER et al.**

No. 97, Sept. Term, 1997.

Court of Appeals of Maryland.

May 12, 1998.

Helen G. Kirsch (Reed, Smith, Shaw & McClay, L.L.P., on brief), Washington, DC, for petitioners.

Jay Fred Cohen, Baltimore (J. Shawn Alcarese, Towson; William F. Jones, Annapolis, on brief), for respondents.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

In February, 1993, petitioners invested $400,000 in a limited partnership formed by respondents. As an inducement to petitioners to make that investment, respondents executed a guaranty agreement, in which they covenanted to return the $400,000 investment, on demand, if (1) the limited partnership sustained a "Net Cash Flow Shortfall" in any three periods, or (2) the gross sales of an affiliated limited partnership did not equal at least $3 million at the end of that entity's first fiscal year.

On December 27, 1994, petitioners demanded the return of their investment, alleging the failure of both conditions. When payment was not forthcoming, they filed suit against respondents in the Circuit Court for Montgomery County.

Although a number of defenses were raised to the action, the one at issue here is venue—whether the suit was properly filed in Montgomery County. One of the respondents, Schulmeyer, lives in Baltimore County; another, Buchsbaum, lives in Howard County; the third, Garcia, lives in Anne Arundel County. None of them live or, so far as this record indicates, are employed, carry on any regular business, or engage in any habitual vocation in Montgomery County. Petitioners, however, live or have their businesses in Montgomery County.

In their complaint, petitioners alleged that the guaranty was executed in Montgomery County and, apparently on that basis, claimed venue in Montgomery County under Maryland Code (1995 Repl.Vol.), § 6–201(b) of the Courts and Judicial Proceedings Article. In relevant part, that section provides that, if, in a multi-defendant case, there is no single venue applicable to all defendants, suit may be brought "in the county where the cause of action arose." Asserting that the guaranty was signed in Howard County, where he lived, Buchsbaum moved to transfer the case to the circuit court for that county. The other respondents, making no factual allegations, moved to dismiss the complaint for a variety of reasons, including want of proper venue in Montgomery County.

The court denied the various motions, and the case was tried, non-jury, on the merits. Finding for petitioners, the court entered judgment in their favor in the amount of $400,-000. Respondents appealed, raising three issues, including venue. In an unreported opinion, the Court of Special Appeals reversed, holding that Montgomery County was not the proper venue. Relying largely on *Bakas v. Marjec, Inc.*, 275 Md. 356, 339 A.2d 662 (1975), the appellate court concluded that the provision in § 6–201(b) allowing suit to be brought "in the county where the action arose" did not apply to a cause of action based on breach of contract unless the contract specified a particular place for payment. As no such place was specified in the guaranty agreement, the court held that suit could be brought only in a county where one of the defendants lived or worked, and not in Montgomery County. In light of that holding, the court did not address the other two issues

raised by respondents. We granted *certiorari* to consider the venue issue, and, as we disagree with the conclusion of the Court of Special Appeals, we shall vacate that court's judgment and remand for it to consider the other issues raised by respondents.

### DISCUSSION

The current venue statutes in Maryland are found in §§ 6–201 through 6–203 of the Courts and Judicial Proceedings Article. The general venue provision is in § 6–201:

"(a) *Civil actions.*—Subject to the provisions of §§ 6–202 and 6–203 and unless otherwise provided by law, a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation. In addition, a corporation also may be sued where it maintains its principal offices in the State.

(b) *Multiple defendants.*—If there is more than one defendant, and there is no single venue applicable to all defendants, under subsection (a), all may be sued in a county in which any of them could be sued, or in the county where the cause of action arose."

Section 6–202 sets forth additional venue for 13 specific, enumerated kinds of actions, and § 6–203 limits venue in five other kinds of actions. Neither of those sections applies here. The breach of contract action in this case is governed by § 6–201.

The issue before us is one of statutory construction—does the provision in § 6–201(b) allowing an action to be brought in the county where the cause of action arose apply to an action for breach of contract when the contract does not specify a place for performance? As with any issue of statutory construction, our task is to search for, attempt to ascertain, and then implement the legislative intent. In this instance, that requires some consideration of the developmental history of Maryland's venue law, now codified in § 6–201. We shall

start, however, with *Bakas v. Marjec, Inc.,* the case found dispositive by the Court of Special Appeals.

The defendants in that case, Bakas and Psoras, signed a promissory note for $20,000 to the plaintiffs. The note, which was due on April 28, 1973, was signed in Montgomery County. It was made payable "at such place as the payee or holder hereof may designate in writing. . . ." In February, 1974, without ever having designated a place for payment in writing, the plaintiffs sued the defendants on the note in the Circuit Court for Montgomery County. In their complaint, they asserted that Bakas resided in Baltimore City, that Psoras resided in Baltimore County, but that "the place of making and delivery of said note was Montgomery County and that Defendants have otherwise transacted business in this County."[1]

The defendants, who were served in Baltimore County, filed motions raising preliminary objection, under former Maryland Rule 323 a., contending that they were not residents of Montgomery County, that they were not employed there, and that they did not carry on a regular business or vocation in that county. Accompanying each motion was an affidavit attesting that the defendant was a resident of Baltimore County and regularly conducted his business from that county. In response, the plaintiffs filed an unverified opposition, stating simply that venue was proper in Montgomery County, that the note was executed in that county, and that both defendants "are alleged in the Declaration to be transacting business in Montgomery County. . . ." The court overruled the motions without comment and without making any findings of fact as to the defendants' residences or places of employment. Apparently, it concluded that venue was proper in Montgomery County because the note was executed there, which was

---

1. The record extract filed in *Bakas* does not contain the caption of the complaint. The text, which is reprinted, makes no averment as to the defendants' residences. Presumably, the alleged addresses of the defendants were shown in the caption. The docket entries reveal that service on Bakas was first attempted in Baltimore City; the summons for Psoras was sent to Baltimore County.

the point of the plaintiffs' argument. From the judgment ultimately entered on the note, the defendants appealed, pressing, among other defenses, lack of venue.

Noting the lack of any finding as to whether the defendants were residents of the same or different counties and the trial court's apparent conclusion that venue existed in Montgomery County under § 6–201(b) because the cause of action arose there, we responded:

> "This is a concept peculiarly applicable to an action in tort. While we are not prepared to intimate that it may never be availed of in a contract action, it cannot be invoked here because the note contained no provision that it was *payable* in Montgomery County, and there is nothing in the record to indicate that Marjec ever exercised the right accorded it by the note to fix a place of payment."

*Id.* at 360, 339 A.2d 662 (emphasis added). We remanded the case for the court to determine (1) whether, when the suit was filed, Bakas was a resident of Baltimore City and Psoras was a resident of Baltimore County, and (2) if so, whether either could otherwise be sued in Montgomery County because he was regularly engaged in business there.

The holding in *Bakas,* under the facts presented in that case, was correct. If, as the defendants attested under oath, they both lived and worked in Baltimore County and neither one carried on business, employment, or vocation in Montgomery County, there would have been a single venue applicable to them and § 6–201(b) would have no application at all. Absent a proper finding by the trial court on that matter, the judgment could not be affirmed. As we shall see from our survey of the history of § 6–201, however, the provision in § 6–201(b) allowing an action to be filed where the cause of action arises is no longer peculiarly applicable to an action in tort; it applies to an action for breach of a promise to pay money as well, even if the agreement from which the promise arises does not specify a particular place of payment.

Like many common law rules and doctrines, venue has an ancient lineage, one that originally was tied to the early, and

long-since discarded, role of jurors as knowledgeable witnesses rather than as impartial determiners of fact based on evidence heard in court.[2] In *Crook v. Pitcher*, 61 Md. 510, 513 (1884), we observed that, at early common law, the plaintiff was required to state with precision not just the county, but the particular district or "hundred" within which the action arose, so that "the sheriff might summon as jurors, persons from the immediate neighborhood, who were presumed to be acquainted with the nature of the transaction, which they were called upon to try, and who were liable to be attainted, if they rendered a wrong verdict."[3] That requirement, tying venue

2. Although there are more ancient antecedents reported in English legal literature, the jury system really developed after the Norman Invasion, and particularly during the reign of Henry II (1154–1189), when trial by jury began to replace trial by ordeal. For a detailed recitation of the early history of juries, *see* James B. Thayer, *The Jury and Its Development*, 5 Harv. L.Rev. 249, 295, 357 (1892); *see also* 1 FREDERICK POLLACK AND FREDERICK W. MAITLAND, THE HISTORY OF ENGLISH LAW, 138–154 (1899). Jurors performed a different function in those early days. They were not impartial arbiters who decided facts based on evidence heard in court, as is the case today, but individuals from the community who already possessed personal knowledge about the parties and the matter in dispute and were to decide the case, or present evidence to the judge, based on that personal knowledge. As Thayer notes, "the conception was that the jury in general knew the facts, and that they were able to judge the truth of these conflicting statements" made by the parties or their counsel. Thayer, *supra*, 5 Harv. L.Rev. 295 at 316.

3. Under Saxon organization, England was divided into counties, or shires, which, in turn, were divided into hundreds. The hundreds were of varying size, but were comprised of ten tithings. A tithing consisted of ten freeholders and their families. Each hundred had a court, which initially sat 12 times a year, but, by 1234 began sitting more frequently. That form of organization, created initially by Alfred the Great, continued to exist, in modified form, into Blackstone's time. *See* 1 POLLOCK AND MAITLAND, *supra*, at 556–60 (1899); 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, *113–114. As Thayer points out, "Always [the jurors] were from the neighborhood—*de visineto*. This expression was not precisely defined, beyond its meaning from the same county; but in practice it went much further. It became the practice to require that a certain number of the jury should come from the particular hundred in question; and these men were expected to inform the others." Thayer, *supra*, 5 Harv. L.Rev. 295 at 297. The practice of attaint is also described by Thayer: "For centuries the great check upon the jury was the attaint, *i.e*, a proceeding in which the original parties

to the immediate neighborhood where the cause of action arose, continued to be the rule in England into the Seventeenth Century. Coke observed that "[t]he most general rule is that every trial shall be out of the town, parish, or hamlet ... within which the matter of fact assignable is alleged, which is most certain and nearest thereunto." EDWARD COKE, THE FIRST PART OF THE INSTITUTES OF THE LAWS OF ENGLAND, 125 (14th ed. 1791). As we noted in *Crook v. Pitcher,* however, the required local nexus became inconvenient, "especially in mixed transactions which might happen partly in one place, and partly in another," and, as a result, (1) venue became an action-based, rather than a juror-based concept, and (2) a distinction was recognized between actions that were "local"— those which could only have arisen in a particular place—and those which were "transitory," founded on events or transactions that might have taken place anywhere. *Crook, supra,* at 513.

Actions for damages to real property, for nuisance, or for the obstruction of one's right of way were regarded as local and had to be brought where the cause of action arose; if brought elsewhere, they were subject to dismissal on demurrer. *Id.* at 513–14; *see also Patterson v. Wilson,* 6 G. & J. 499, 500 (1836). Actions for personal injury or injury to personal property and actions based on transactions, including for breach of contract, were regarded as transitory. Under English law, if the action was a transitory one, it could be brought "wherever the defendant could be reached with process," *Eck v. State Tax Comm. of Md.,* 204 Md. 245, 250, 103 A.2d 850, 853 (1954), although the court could change the venue if the action was not brought where it arose. *See* 2 JULIAN J. ALEXANDER, ALEXANDER'S BRITISH STATUTES at 659 (2d

---

and also the first jury were parties, and where a larger jury, made up of knights or other more considerable persons than the first, passed again on the same issue. If they found contrary to the first finding, then the first jury was convicted of perjury and heavily punished; and the first judgment was reversed." Thayer, *supra,* 5 Harv. L.Rev. 357 at 366. The attaint "proceeded on the theory that the first jury had wilfully falsified, and so was punishable." *Id.* at 364. *See also* 3 BLACKSTONE, *supra,* at *351, *403–04.

ed.1912). The practice in Blackstone's time, it appears, was still to have civil cases tried "in the county where the cause of action arises, and the witnesses and jurors live," a practice he characterized as "most excellently calculated for the saving of expense to the parties." 3 BLACKSTONE, *supra,* * 355.

Until changed by statute in 1852, suits at law in Maryland were initiated by the issuance of a *capias ad respondendum*— a judicial writ under which the defendant was either taken into custody or required to give bail for his appearance. *See State v. Gittings,* 35 Md. 169, 172 (1872); *Swanson v. Wilde,* 74 Md.App. 57, 62 n. 3, 536 A.2d 694, 696 n. 3, *aff'd,* 314 Md. 80, 548 A.2d 837 (1988); 1852 Md. Laws, ch. 76. That, of course, made it particularly inconvenient for a defendant to be sued outside the county of his or her residence. Apparently as early as 1714, the Provincial Assembly attempted to remedy that problem by requiring transitory actions against a Maryland resident to be brought where the defendant resided. *See The Laws of the Province of Maryland* 78–79 (1714); *see also Patterson v. Wilson, supra,* 6 G. & J. 499, 500–503.[4] That requirement, in modified form, was reenacted in 1796 and again in 1801. The 1796 Act (1796 Md. Laws, ch. 43, § 14) declared that "it shall not be lawful for any person whatsoever to cause any inhabitant of this state to be arrested out of the county where he or she doth reside, by virtue of any *capias ad respondendum,* or *capias ad satisfaciendum,* for any debt, damage or cost, until the sheriff or coroner of the county where such defendant shall reside shall have returned a *non est inventus* ...."[5] Under the 1801 law (1801 Md. Laws, ch.

---

**4.** The 1714 statute required plaintiffs having a personal claim or demand not exceeding the value of 20 pounds sterling or 5,000 pounds of tobacco against any inhabitant of the province to bring their action in the county courts "where their Debtors inhabit and reside, and not Elsewhere, on penalty of suffering a Non-suit and paying the Defendant his reasonable Charges." As was common in those days, the Act had a three-year "sunset" provision, but it was renewed several times and was eventually replaced with statutes enacted after Independence.

**5.** As noted in *Swanson v. Wilde, supra,* 74 Md.App. at 62, 536 A.2d at 696, a *capias ad satisfaciendum* was a writ of execution commanding

74, § 11), as under the Provincial law of 1714, if a defendant was arrested upon a *capias ad respondendum* "contrary to the intent of this act," the plaintiff not only suffered a nonsuit but was required to pay the defendant "his or her reasonable costs and charges." The only caveat to the requirement of suing the defendant where he or she resided was that a defendant who absconded from justice in his or her county was subject to being arrested "in any county where they may be found."

Much of the subsequent history of the Maryland venue law was described by the Court of Special Appeals in *Swanson v. Wilde*. It became a bit of a hodgepodge. The general venue statutes applicable to actions at law became codified in Article 75 of the Code, dealing with Pleadings, Practice and Process At Law. As amended through 1966, § 75 of that article, dealing with actions against individuals, provided, in essence, that:

(1) A defendant could not be sued at law out of the county in which he or she resided unless the sheriff returned a *non est* on a summons issued in that county or the defendant "abscond[ed] from justice in the county where he lives," in which event, the defendant could be sued "in any county where he may be found."

(2) If the defendant resided in one county but carried on any regular business or habitually engaged in any vocation or employment in another county, the defendant could be sued in either county.

(3) In an action *ex delicto*, in which all of the defendants were not residents of or carrying on a regular business or habitually engaged in a vocation or employment in one county, the plaintiff could sue all of the defendants in the county where the cause of action arose or where any of them resided, carried on a regular business, or habitually engaged in a vocation or employment.

_____

the sheriff to seize and produce the defendant before the court to satisfy damages or debt in certain actions.

(4) In an action *ex delicto* based on negligence, the plaintiff could sue "the defendant or defendants" in the county where the cause of action arose.

Section 75A, dealing with actions against corporations, provided, in general, that a corporation could be sued in the county where its principal office was located, where it regularly did business, or where "the subject matter of the action lies." A corporation that had no principal office in the State and that did not regularly do business in any county could be sued in the county where the plaintiff resided or "where the subject matter of the action lies." If the corporation was a surety on a bond required to be filed in a court or with other enumerated officials, the suit could be filed in the county where the bond was filed.

Apart from those general venue statutes in Article 75, there grew up over the years a variety of special venue statutes placed in other Articles of the Code. Article 16, dealing with equity cases, had a number of such statutes. Section 22 provided that an action for divorce or annulment could be filed in the county where either the plaintiff or the defendant resided, where the defendant was regularly employed or had a place of business, or, in an annulment case, where the marriage ceremony sought to be annulled was performed. Section 68 provided a number of alternative venues in adoption cases. Section 100 required actions for partition of land or to foreclose a mortgage or enforce any other lien on land to be filed in the county where the land, or some part of it, lay, even if some or all of the defendants lived elsewhere. Section 101 provided, with respect to other equity cases, that if the defendants resided in different counties, "the court where any one of the defendants resides shall have jurisdiction, and the bill or other proceeding may be filed or had in such court." In Article 50, dealing with joint obligors and joint tenants, § 5 provided that "[i]n any action ex contractu in which all of the defendants are not residents of the same county, the plaintiff at his election may sue all said defendants in the county in which any one of the defendants resides or regularly does business."

The current venue statutes, most of which are consolidated in §§ 6–201 through 6–203 of the Courts and Judicial Proceedings Article, were the product of Code Revision—the enactment in 1973 of the Courts and Judicial Proceedings Article. Although most of the documents forming the legislative history of that Article have, regrettably, been lost or destroyed, a fair indication of legislative intent is discernable from the Revisor's Note to § 6–201 that accompanied the bill and was reprinted in the initial 1973 volume of the Article, and from Report No. 3F, submitted by the Governor's Commission to Revise the Annotated Code to the General Assembly on July 16, 1973. Both documents make clear that, unlike the usual function of code revision, which is to reorganize, clarify, and restate existing law without making substantive changes to it, the rewriting of the venue laws included some substantive changes. In its section on venue, the Commission's Report states, in relevant part:

> "The draft attempts to minimize the distinction between local and transitory causes of action to the fullest extent possible. Venue is treated pragmatically with § 6–201 stating the general rule that a defendant should, when possible, be tried in a county which is convenient for him—*i.e.,* where he lives or works. If present law allows an alternative venue as it does in certain cases, the additional venue is set out in § 6–202. It should be noted that a plaintiff may choose a venue from either section, and that § 6–201 is not controlling if an alternative venue is provided. Some of the actions [that] are covered in § 6–201 and § 6–202 are transitory and some are local.
>
> . . .
>
> The venue provisions of Title 6 are, if anything, slightly broader than the provisions of the present law. For example, where a section provided that in certain cases an action may be brought where the defendant lives, it has been superseded. Section 6–201 allows the action to be brought where the defendant works as well as where he lives. With the advent of the automobile and the resulting increase in

mobility the change is of minor significance and should cause no inconvenience."

The Revisor's Note attached to § 6–201 repeats some of those concepts. In describing § 6–201, it points out that "[s]ubsection (b) contains the multiple defendant provisions presently appearing in Article 75, § 75(b) with respect to tort actions, Article 50, § 5 with respect to contract actions and Article 16, §§ 100 and 101 with respect to suits in equity." That Sections 6–201 and 6–202 provided for some expansion or liberalization in the preexisting venue law was confirmed by William H. Adkins II, then the Director of the Commission to Revise the Annotated Code and later a judge of the Court of Special Appeals and this Court, shortly after enactment of the Courts and Judicial Proceedings Article. In *Code Revision in Maryland: The Courts and Judicial Proceedings Article,* 34 Md. L.Rev. 7, 36 (1974), Judge Adkins noted that the new statutes probably reflected "a modest liberalization of venue provisions." *See also Hansford v. District of Columbia,* 329 Md. 112, 123, 617 A.2d 1057, 1062 (1993), where we noted a substantive change made by § 6–201 with respect to actions against corporations.

It is with this background that we examine § 6–201(b) more closely, in light of *Bakas v. Marjec, Inc., supra,* 275 Md. 356, 339 A.2d 662.

There can be little doubt that, had this action been brought under the laws existing prior to the enactment of § 6–201, venue would not lie in Montgomery County. Notwithstanding respondents' unsubstantiated, unverified assertion, none of the petitioners appear to live, carry on regular business, or habitually engage in employment or vocation in that county, and there is no indication that any have absconded from justice in their home counties. Although initial summonses were returned *non est,* those summonses were issued out of Montgomery County, not out of any of their home counties. Venue in Montgomery County could not have been founded on Article 75, § 75(a). The only statute allowing an action against multiple defendants to be brought where the cause of action

arose was Article 75, § 75(b), but that statute was plainly limited to actions *ex delicto*. Petitioners' only choice under the old law would have been to invoke Article 50, § 5 and sue all three defendants in either Anne Arundel, Baltimore, or Howard County.

What the Legislature did in crafting § 6–201(b), however, was to merge the provisions of Article 75, § 75(b) and Article 50, § 5, into one general alternative venue provision. That intent is unmistakably revealed, not just in the wording of the new statute, but as well in the Revisor's Note to it, pointing out that § 6–201(b) "contains the multiple defendant provisions presently appearing in Article 75, § 75(b) with respect to tort actions [and] Article 50, § 5 with respect to contract actions...." Section 6–201(b) is not limited, either expressly or implicitly, to actions *ex delicto*. In declining "to intimate that [§ 6–201(b)] may never be availed of in a contract action," we essentially recognized in *Bakas* that the section did extend to actions for breach of contract, at least under certain circumstances. *Bakas, supra,* 275 Md. at 360, 339 A.2d at 664. We turn now to those circumstances.

If there is no other single venue common to all defendants, the statute allows an action to be brought "where the cause of action arose." The question, simply, is where a breach of contract action arises. If the alleged breach is the failure to make a payment called for in the contract and the contract specifies a place for payment, courts have held that venue lies in the county where the payment was agreed to be made. *Bakas* confirms that much. If the contract does not specify a place for payment, most State courts have held that venue under a "where the cause of action arose" statute lies where the creditor resides or has its place of business, on the theory that the debtor has a duty to seek out the creditor. *See Gill v. Justice of Peace,* 111 Colo. 160, 139 P.2d 271, 272 (1943); *Saf–T–Clean, Inc. v. Martin–Marietta Corporation,* 197 So.2d 8, 9 (Fla.1967); *Shearer v. Farmers' Life Ins. Co.,* 106 Kan. 574, 189 P. 648, 650 (1920); *Halliwill v. Mutual Service Casualty Insurance Co.,* 257 Minn. 252, 100 N.W.2d 817, 818 (1960); *State v. Circuit Court,* 221 Or. 309, 351 P.2d 39, 40 (1960);

*Banner Printing Co. v. Bykota Corp.*, 182 W.Va. 488, 388 S.E.2d 844, 847–48 (1989); *Land O'Pines Dairy Products* v. *McGraw*, 564 S.W.2d 120 (Tex.Civ.App.1978); *Lucas Enterprises, Inc. v. Paul C. Harman* Co., 273 Pa.Super. 422, 417 A.2d 720, 721 (1980); *Insituform of N. America v. Miller Insituform*, 695 S.W.2d 198, 200 (Tenn.Ct.App.1985); Jay M. Zitter, Annotation, *Place Where Claim or Cause of Action "Arose" under State Venue Statute*, 53 A.L.R.4th 1104 (1987); *also Deering Milliken Research Corp. v. Textured Fibres, Inc.*, 310 F.Supp. 491, 500 (D.S.C.1970).

The underlying premise that, in the absence of an agreement to the contrary, a debt is payable at the place where the creditor resides or has its principal place of business is an old and well-established one. *See Gill, supra*, 139 P.2d at 272, quoting from 48 C.J. 592, 593. The cases cited above simply extend that premise to conclude that (1) a cause of action for breach of the promise to pay arises where the breach occurs, and (2) the breach occurs where the debt was payable. *See* 77 AM.JUR.2D *Venue*, § 41 (1997):

> "In an action involving the breach of an agreement for the payment of money, it is the general rule that the cause of action accrues where payment is to be made, or, if no place of payment is specified, where the creditor resides or has its place of business."

We see no reason not to follow this general rule.[6] It allows the parties to a contract to select at the outset a mutually

---

6. A number of Federal courts, construing 28 U.S.C. § 1391(a), have taken a different position, one that we elect not to follow. Section 1391(a) provides venue in diversity cases in the judicial district where all plaintiffs or all defendants reside "or in which the claim arose." Establishing venue under that statute is regarded as a Federal question, to be determined in accordance with Federal law. *Leroy v. Great W. United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). The problem surfaces in multi-party cases, where neither all plaintiffs nor all defendants reside in the same district and the claim arguably arose in more than one district. In attempting to determine where, in such a situation, "the claim arose," the courts have developed what the Eighth Circuit Court of Appeals characterized as a "bewildering variety of tests to ascertain where claims arose under § 1391." *Missouri Housing*

acceptable alternative venue, either directly or by specifying in the contract where payment is to take place. If they choose not to specify a place for payment, it is reasonable for the creditor to expect that payment will occur where the creditor lives or has its place of business; indeed, where else would either the creditor or the debtor expect the payment to be made under that circumstance? As the cases hold, if there is a breach occasioned by nonpayment, the breach occurs in the county where the payment was expected to be made. That is where the plaintiff's cause of action arises.

In a way, we have come full circle. Eight hundred years ago, venue was set where the cause of action arose, and, in this circumstance, at least, it has returned there. The factors that compelled a deviation in favor of rigidly forcing plaintiffs in transitory actions to sue defendants where they lived or worked are less compelling now and, as the Commission to Revise the Annotated Code noted in 1973, the relaxation of the rigid standard should create no serious inconvenience to defendants. Maryland is a small State with a good network of roads, highways, and public accommodations. In a multi-defendant breach of contract case, when there is no single venue applicable to all defendants, it is not inherently unreasonable to allow the plaintiff to sue the defendants where the cause of action arose, in this case where the debt was expected to be paid. If, in any particular case, that venue proves to be inconvenient, the defendant may seek to have it changed under Maryland Rule 2–327(c) or, in the District Court, under

---

*Development Commission v. Brice,* 919 F.2d 1306, 1309 (8th Cir.1990); *see also Broadcasting Co. v. Flair Broadcasting,* 892 F.2d 372, 375 (4th Cir.1989). As noted in *Broadcasting Co.,* at 376–77, some courts have applied the "weight of the contacts" test, placing venue in the district "having the most significant ties to the claim." Others have applied a "substantial contacts" test, looking to whether "a substantial portion of the acts giving rise to the plaintiff's claim occurred in this district," quoting from *Frontier Federal S & L Assn. v. National Hotel Corp.,* 675 F.Supp. 1293, 1300–01 (D.Utah 1987). Some, apparently, have applied both of those tests. Other courts, following more closely the State approach, have adopted the "place of intended performance" test, and still others have adopted both the "substantial contacts" and the "place of performance" tests. We do not need to wander into that thicket.

Maryland Rule 3–326(b). For these reasons, we disavow the suggestion in *Bakas* that the "where the cause of action arose" provision in § 6–201(b) is not generally applicable to breach of contract actions,[7] and we vacate the judgment of the Court of Special Appeals.

JUDGMENT OF COURT OF SPECIAL APPEALS VA-CATED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS ON OTHER ISSUES RAISED IN THAT COURT; COSTS IN THIS COURT TO BE PAID BY RESPONDENTS; COSTS IN COURT OF SPECIAL APPEALS TO ABIDE THE RESULT IN THAT COURT.

---

**7.** The belief expressed by the *Bakas* court that venue based on where the cause of action arose was peculiarly applicable to tort actions was understandable, even if, as we now hold, erroneous. Until January 1, 1974, when the Courts and Judicial Proceedings Article took effect, the only general provision allowing venue in a suit against non-corporate defendants to be based on where the cause of action arose was, indeed, limited to actions *ex delicto*. That provision had been in the law since 1945 (*see* 1945 Md. Laws, ch. 468) and was, no doubt, familiar to the Court. Neither brief in *Bakas* called particular attention to the change made by § 6–201.