218 F.2d 705
 55-1 USTC P 9181
 William J. MALONEY, Appellant,
v.
James M. TUNNELL, Sr., As Administrator Cum Testamento
Annexo of the Estate of Norman Collison, Formerly Collector
of Internal Revenue for the Collection District of Delaware,
Substituted Appellee, and Ernest E. Killen, Present
Collector of Internal Revenue for the Collection District of
Delaware, and Frances P. Graham, Presently Director of
Internal Revenue, Wilmington, Delaware Office, United States
of America, Intervenor.
 No. 11336.
 United States Court of Appeals, Third Circuit.
 Argued Dec. 20, 1954.
Filed Jan. 25, 1955.
 
 Edwin D. Steel, Jr., Wilmington, Del. (Edward W. Cooch, Jr., Wilmington, Del., on the brief), for appellant.
 Kurt W. Melchior, Washington, D.C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Robert N. Anderson, Kurt W. Melchior, Sp. Assts. to Atty. Gen., Leonard G. Hagner, U.S. Atty., Wilmington, Del., on the brief), for appellees.
 Before GOODRICH and KALODNER, Circuit Judges, and LORD, District Judge
 GOODRICH, Circuit Judge.
 
 
 1
 This is a family partnership case. The Commissioner assessed a deficiency against the taxpayer for the years 1946 and 1947 on the theory that the business carried on under the name Maloney Leather Company was not a partnership for the purposes of the federal income tax law. The taxpayer, William J. Maloney, Sr., paid the assessment and brought suit in the United States District Court for the District of Delaware to recover what he claimed was erroneously assessed against him. The jury returned a verdict for the defendant and the taxpayer appeals.
 
 
 2
 The trial court, in submitting this case to the jury, asked them a number of specific questions. The fifth interrogatory[1] which he asked the jury was:
 
 
 3
 'Did Mr. Maloney make valid and bona fide gifts to his wife and son which were used and invested in the Maloney Leather Company business?
 
 
 4
 'You will answer that question 'yes' or 'no' as to each of the two persons as follows:
 
 
 5
 '(a) As to Mrs. Maloney:
 
 
 6
 .................... (Answer 'Yes' or 'No')
 
 
 7
 '(b) As to Mr. Maloney, Jr.:
 
 
 8
 .................... (Answer 'Yes' or 'No')'
 
 
 9
 The jury returned a negative answer as to both Mrs. Maloney and Mr. Maloney, Jr. These two persons were the other members of the alleged partnership in addition to the taxpayer.
 
 
 10
 Appellant's theory now is that there was evidence from which the jury could have come to a conclusion favorable to him upon this fifth interrogatory. If so, he says, a finding of partnership would have been required. The jury was prevented from doing so, the appellant argues, because of errors which were committed by the district court in the course of the trial.
 
 
 11
 The appellant first complains of various errors made by the court in its charge to the jury. It is a serious question whether the appellant is in a position to complain of these alleged errors. Through his counsel he made a blanket objection to almost all the requests for instructions to the jury which the defendant submitted and the court granted.[2] It is clear under the Federal Rules of Civil Procedure 28 U.S.C., that a general objection without giving reasons therefor is insufficient. Fed.Rules Civ.Proc. rule 51. It appears from the list of instructions asked for by the plaintiff, that the parts of the charge now objected to were contained in such request for instructions. This is emphatically not a case where there is such obvious miscarriage of justice that the court should listen to objections pointing out what now appears to be error although not noticed at the time of the trial.
 
 
 12
 Even if we do not turn our backs upon the complaint concerning the instructions because of the rule just discussed the appellant fares no better.
 
 
 13
 There are three points here. The first is that the trial judge had imposed upon plaintiff the burden[3] of proving 'that the business was benefited' by its change from individual ownership to partnership form. The best answer to this is to look and see just what the judge said. Here it is:
 
 
 14
 'When I speak of a 'business purpose', I mean whether any purpose for the benefit of the partnership was served by the alleged inclusion of the wife and son as partners herein.'
 
 
 15
 We do not see in this statement a requirement that the business enterprise must be benefited by or improved by changing into a partnership. We think rather that the understanding of the jury or anybody else from the words quoted is that the formation of the partnership must be to conduct a business enterprise, which is certainly what a commercial partnership is. We see no basis for the argument that such a benefit was 'a sine qua non to a verdict in plaintiff's favor' as the appellant urges.
 
 
 16
 The next objection made to the judge's charge is to this sentence:
 
 
 17
 'If you find that William J. Maloney, Sr., had it within his sole power to distribute or not to distribute to his wife and son any portion of the earnings of the Maloney Leather Company, then you must find that such earnings are taxable to the husband and not to the other members of his family.'
 
 
 18
 This objection shows how fine a bead a lawyer with 20-20 legal vision can draw and how high powered a competent lawyer's microscope can become when examining the words used in a charge to a jury which occupies several printed pages. Appellant in this case, in his argument to us, italicizes the word 'must' from the above paragraph. In his answer, the appellee takes the same paragraph and italicizes the word 'any.'
 
 
 19
 Neither parties' resorting to italics is so effective as to consider this portion of the charge in view of the testimony in the case. There is a great deal of space devoted to evidence having to do with the control which Maloney, Sr., exercised over the affairs of the company. The instructions to the bank where partnership funds were kept and the articles of partnership all gave the partners a right to draw checks and provided for equalization of earnings at the end of a partnership year. But there was also testimony that this was but a paper arrangement: that the real control was as complete in the senior Maloney after the partnership agreement was drawn up as it was before. That issue was the one to which the court's instruction was directed. Read with that in mind there was nothing misleading about it even though one may raise a question as to a particular word when the paragraph is lifted out of its context and removed from the background of this case.
 
 
 20
 A third objection made by the taxpayer has to do with motive. The judge charged:
 
 
 21
 'In order to prevail, the plaintiff must establish to your satisfaction that this was a bona fide partnership for the purpose of jointly carrying on the business because of the contributions of capital and services by the partners and that it was not primarily established for tax avoidance or tax reduction purposes as a means of channeling the taxpayer's income to the members of his family without paying their taxes, the plaintiff would ordinarily have to pay on it.'
 
 
 22
 We think the objection is answered by an excerpt from the court's opinion in Commissioner of Internal Revenue v. Culbertson, 1949, 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659:
 
 
 23
 'The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case (Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670), but whether, considering all the facts-- the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent-- the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *'[4]
 
 
 24
 The trial judge had, we think, pretty evidently read the Culbertson case before he gave his instructions here. We think also that he had looked at our opinion in Lamb v. Smith, 3 Cir., 1950, 183 F.2d 938. In the latter case the situation was not unlike this one, where the taxpayer had paid his assessment and sought to get it back through the district court rather than trying to fight out his dispute before the tax court. The requirement that good faith is an essential part of the formation of such a family partnership runs all through the Culbertson opinion and the paragraph of the instruction complained of, even when torn out of context, puts to the jury the determination of the question of fact, described by the Supreme Court.
 
 
 25
 Aside from the instructions the taxpayer alleges other errors in the course of the trial. One of these has to do with a difference of opinion which the trial judge had with Mr. Maloney when she was on the witness stand. The taxpayer had granted to Mrs. Maloney and Maloney, Jr., undivided interests in the real estate upon which the tanning business owned by Maloney, Sr., and transferred to the partnership was carried on. Mrs. Maloney opined that she had legal power to transfer her interests in the joint tenancy without joinder of the other joint tenants. The court told her she was wrong and after discussing it with appellant's counsel said, 'I think you are wrong on that * * * I will look it up. It has nothing to do with the matter under discussion.' The question was brought up again the next day by appellant's counsel and the court's impression was corrected. When the government brought the question up the third the point had nothing to do with that the point had nothing to do with the case and he was sorry he had originally brought it up. He made no comment upon it in his instructions to the jury although appellant asked him to do so. It is now suggested that the judge's disagreement with Mrs. Maloney on a point of Delaware real estate law somehow prejudiced her in the mind of the jury and hurt the plaintiff's case. We think only counsel desperate against an adverse verdict of the jury would have suggested the point. The nature of joint tenancy in Delaware was not relevant to the case. It was just one of those things that creep in during a trial to the surprise of everybody and we think the trial judge did just right in getting rid of it as soon as he could.
 
 
 26
 More important is what took place just before the jury returned its verdict. The jury retired to consider the case at 3:00 P.M., June 1, 1953. At 10:00 P.M. the jury resumed their seats in the court room and the following colloquy took place between the court and jury:
 
 
 27
 'The Court: Gentlemen, have you anything to report?
 
 
 28
 'The Foreman: No, your Honor, I have nothing I can tell you as to a definite answer on any of your five questions.
 
 
 29
 'The Court: Are you apart?
 
 
 30
 'The Foreman: We are apart.
 
 
 31
 'The Court: How far are you apart, Mr. Wilcox?
 
 
 32
 'A Juror: You mean by numbers?
 
 
 33
 'The Court: No, don't tell me that. Is it substantial disagreement?
 
 
 34
 'A juror: I felt in the past half-hour we might come to some conclusion in the next hour. I don't know. Perhaps that is a happy thought. I am not sure.
 
 
 35
 'The Court: Mr. Logue, let us have the benefit of your experience with the courts.
 
 
 36
 'Mr. Logue: I agree with what Mr. Wilcox said.
 
 
 37
 'The Court: Do you think I ought to send you back for a half-hour?
 
 
 38
 'Mr. Logue: It might be well.
 
 
 39
 'The Court: All right, ladies and gentlemen, go back and come back in a half-hour.'
 
 
 40
 At 11:40 o'clock the jury again resumed their seats in the jury box and its members and the court conversed as follows:
 
 
 41
 'The Court: Mr. Yost, have you anything to report to the Court?
 
 
 42
 'The Foreman: Your Honor, I think we have made some progress since we last were here. On at least one question we have switched from an almost tie vote to a practically unanimous vote on one of the first four questions, and I would think it reasonable to expect that there would be considerable correlation in the answers to those four questions.
 
 
 43
 'I would like to say that the jurors are really and conscientiously trying to reach a unanimous verdict. Our relationships are excellent. It is certainly not hopeless that we can't work with each other, and although I would like very much to go home tonight, I think that we have gone to the expense and trouble that we have, and frankly I think it is my duty to society that we continue to struggle with this thing.
 
 
 44
 'The Court: I won't hold you after midnight.
 
 
 45
 'The Foreman: I think there has been some shift. We finally got a vote which instead of being practically fifty-fifty-- would it be out of order to tell you how close we are to unanimity on one question?
 
 
 46
 'The Court: I am willing to be told if counsel are.
 
 
 47
 'Mr. Cooch: No objection from me, your Honor.
 
 
 48
 'Mr. Margolis: Without stating which way it is going, your Honor.
 
 
 49
 'The Court: All right.
 
 
 50
 'The Foreman: One of the first four questions, we have now reached an 11 to 1 vote. When I came back here before it was a 7 to 5 vote.
 
 
 51
 '* * * (The court here told the jury that an answer to the first question would make two, three and four automatically follow. This he later recognized was erroneous and he and counsel went to the jury room and so told jury.[5] )
 
 
 52
 'The Foreman: We think they are very close together.
 
 
 53
 'In talking to the jurors I have tried very hard to keep our minds on the track of one question and to get an answer to that one question; and, true, we all recognize the similarity and I have promised the jurors that we would give individual considerations to the next questions, and I have resisted their attempts to switch from one question to the other, although I see the logic in what you say. So far the jurors have only cast their vote on this one question.
 
 
 54
 'The Court: I am going to send you back and we will sit until midnight, but not after 12 o'clock. I will have to discharge you if you can't agree.
 
 
 55
 'This is not said by way of criticism. I realize how diligent and how loyal each and every one of you is to the oath you have taken; but, as Mr. Yost said, this has cost the Government money to try the case and it has cost the plaintiff money to try the case, and it does seem somewhat of a shame if you can't come back with a verdict. It would mean that this case will be postponed until the late Fall and then have to be tried all over again.
 
 
 56
 'I respect so much the view of each and every one of you and I know you are sincere in your point of view. You have given your time in the performance of your duty of your American citizenship, and I do not feel unkindly about your inability to reach a verdict at all. I realize that each of you is trying to be loyal to your own point of view sincerely. So go back and make one more try. I want you back at 12 o'clock.'
 
 
 57
 We have set all this out, perhaps at undue length, because counsel makes a good deal of it and the subject of jury coercion has been in the federal reports, seemingly, a good many times. Most of the cases in which the point has been raised are criminal cases. In one civil case it was said that the tendency of the charge given was 'to bring the one juror to an agreement with the others even against the dictates of his own judgment.' St. Louis & S.F.R. Co. v. Bishard, 8 Cir., 1906, 147 F. 496, 502. If what the judge does is actually to coerce the jury we should suppose that the rule should be the same in both civil and criminal cases. But perhaps the criminal law area is more sensitive due to the necessary protection of an accused's constitutional rights.
 
 
 58
 The Supreme Court made it quite clear in 1926 that it was reversible error for the trial judge to inquire from a jury 'how it was divided numerically.' Brasfield v. United States, 1926, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345. The Fifth Circuit has hold us through Judge Sibley that comments 'not upon the evidence, but reflecting on the jurors, are not permissible.' In this case the trial judge sent a disagreeing jury back with the comment to it that it was apparent to him that 'some of you are violating the sacredness of your oaths as jurors.' This kind of pressure, the court thought, would not do. Kesley v. United States, 5 Cir., 1931, 47 F.2d 453, 454, 85 A.L.R. 1418. And in United States v. Samuel Dunkel & Co., Inc., 2 Cir., 1949, 173 F.2d 506, a defense got a new trial in a criminal case because the jury was asked whether they were nearly equally divided or whether it was a pronounced majority. Judge Clark's opinion cites the various cases on the point.
 
 
 59
 It is to be observed that there is no element of what by any stretch of the imagination could be called coercion in this case. The judge wanted to know at 10:00 o'clock whether there was substantial agreement. He did not ask whether there was a minority or majority. He quote obviously wanted to know whether he could expect a verdict pretty soon or whether he could not. Now there was information given him on the way things stood at 11:40 o'clock but this was with the consent of counsel for each side. Appellant's counsel now suggests that he could hardly d anything else than acquiesce in the giving of this information. That argument hardly will stand examination when made on the part of a lawyer who has well earned reputation for trial work. Of course it is counsel's business to object to that which is improper if it jeopardizes the rights of his client.
 
 
 60
 We see not the slightest evidence of coercion of the jury in this case. The judge complimented them on the care which they were giving. There certainly was no threat to a dissenter because the judge held out release at 12:00 o'clock no matter how the case came out. The fact that the jury reached a conclusion between 11:40 and midnight on what it had been working on all day is not evidence of haste or coercion in spite of appellant's argument to that effect. Anyone who has even had a decision to make on any subject has gone through the process of turning it back and forth in his mind, perhaps for a long time, and has had an experience not unlike this jury. When the conclusion comes it frequently comes with a rush and is none the worse for it.
 
 
 61
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 The court submitted five interrogatories to the jury. The first four interrogatories were as follows:
 '(1) Was Elizabeth G. Maloney in good faith joined together with her husband, William J. Maloney, Sr., for the purpose of presently carrying on business and sharing in the profits or losses, and acting with a business purpose, really and truly intended to join together in the then present conduct of a partnership enterprise known as the Maloney Leather Company throughout the taxable year 1946?
 ...................... (Answer 'Yes' or 'No')
 '(2) Was William J. Maloney, Jr., in good faith joined together with his father, William J. Maloney, Sr., for the purpose of presently carrying on business and sharing in the profits or losses, and acting with a business purpose, really and truly intended to join together in the then present conduct of a partnership enterprise known as the Maloney Leather Company throughout the taxable year 1946?
 ...................... (Answer 'Yes' or 'No')
 '(3) Was Elizabeth G. Maloney in good faith joined together with her husband, William J. Maloney, Sr., for the purpose of presently carrying on business and sharing in the profits or losses, and acting with a business purpose, really and truly intended to join together in the then present conduct of a partnership enterprise known as the Maloney Leather Company throughout the taxable year 1947?
 ...................... (Answer 'Yes' or 'No')
 '(4) Was William J. Maloney, Jr., in good faith joined together with his father, William J. Maloney, Sr., for the purpose of presently carrying on business and sharing in the profits or losses, and acting with a business purpose, really and truly intended to join together in the then present conduct of a partnership enterprise known as the Maloney Leather Company throughout the taxable year 1947?
 ...................... (Answer 'Yes' or 'No')'.
 
 
 [2]
 The only exceptions were defendant's request No. 8 and 16. As to No. 8, appellant objected specifically to one part of that request and the court deleted the part referred to by appellant. No. 16 was not objected to at all
 
 
 [3]
 Appellant, on this point, also complains because the trial judge charged that '* * * the plaintiff has a heavy burden to show a bona fide intent to join together with members of the family group, such as children and brothers, or wives, in the conduct of the partnership business for a business purpose.' (Italics supplied by the appellant.) The part omitted by the appellant from the beginning of this sentence, however, casts a different light on the judge's charge. The omitted part is: 'I instruct you that where the important factors are lacking the plaintiff, etc. * * *.'
 
 
 [4]
 In this connection, footnote 12 of the opinion on the next page, 743, of 337 U.S., page 1215 of 69 S.Ct., is also worth quoting from: 'Nearly three-quarters of a century ago, Bowen, L.J., made the classic statement that 'the state of a man's mind is as much a fact as the state of his digestion.' Edgington v. Fitzmaurice, 29 L.R.Ch.Div. 459, 483. State of mind has always been determinative of the question whether a partnership has been formed as between the parties. * * *'
 
 
 [5]
 Appellant contends that this erroneous statement only led the jury to further confusion, but in view of the jury foreman's statement which followed, it is evident that he realized the questions were separate and that an answer to the first did not automatically answer the next three interrogatories