**LOOK MAGAZINE ENTERPRISES S.A., Plaintiff,**

v.

**LOOK, INC. and Howard Kunitz, Defendants.**

**Civ. A. No. 84–290–JLL.**

United States District Court, D. Delaware.

Oct. 16, 1984.

Henry E. Gallagher, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, Del., Richard Lehv of Weiss, Dawid, Fross, Zelnick & Lehrman, P.C., New York City, of counsel, for plaintiff.

William E. Manning of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Del., Victor M. Wigman and Herbert Cohen of Wigman & Cohen, P.C., Arlington, Va., of counsel, for defendants.

## OPINION

LATCHUM, Senior District Judge.

This is an action for trademark infringement and dilution, unfair competition, and injury to business reputation. The case is before the Court on the defendants' pre-answer motion for dismissal or, in the alternative, a stay of proceedings to allow resolution of related litigation before the Trademark Trial and Appeal Board ("TTAB") of the United States Patent and Trademark Office ("PTO"). (Docket Item ["D.I."] 6.)

## I. FACTS

The plaintiff, a Swiss corporation named Look Magazine Enterprises S.A. ("LME"), is the owner by assignment of the trademark "LOOK,"[1] familiar to many Americans as the title of a pictorial magazine. (D.I. 1 at 2–3.) The defendants are LOOK, Inc. ("LI"), a Delaware corporation, and its sole officer, shareholder, and director, Howard G. Kunitz ("Kunitz").

In 1979, Kunitz began laying the groundwork for the publication of a magazine to be titled "LOOK." (D.I. 17 at 30.) A magazine of that name was first published in 1936 and continued in successful publication for many years. (D.I. 1 at 2.) Despite its record of success, LOOK magazine apparently fell on hard times; it ceased publication, resumed it again sometime later, and then once more ceased. (See D.I. 13 at Ex. 5, p. 3.) Kunitz was "watching carefully the activities of LOOK magazine with great interest ...." (D.I. 17 at 32.) He stated in deposition testimony that "when I noticed how [the magazine] was being handled, I remember ... I asked ... an attorney in Washington, D.C., to write to New Sound, Inc. [-the publisher and then-owner of the "LOOK" mark-], to find out if they ever had any intentions of doing this again," (id.) meaning, it seems, did New Sound, Inc., intend to publish LOOK again. Although that company responded to Kunitz's lawyer that "Look magazine was published and widely distributed in interstate commerce between January and September of 1979 and further uses of the trademark are contemplated," (D.I. 13 at Ex. 4), Kunitz eventually determined to go forward with his plans to publish a new edition of LOOK. (D.I. 17 at 33.)

A part of those plans involved Delaware. In April of 1982, Kunitz retained a Delaware law firm to help him incorporate defendant LI (D.I. 6 at Kunitz Affidavit, p. 2; D.I. 17 at 22), and, at his request, these attorneys, representing his Delaware cor-

1. LME owns three related "LOOK" trademarks listed on the Principal Register in the PTO: Registration No. 781,779, for the mark "LOOK" for a magazine published every two weeks; Registration No. 1,132,175, for the mark "LOOK" for a pictorial magazine, and Registration No. 1,243,458, for the mark "NEW LOOK" for prerecorded video cassettes (video magazines). (D.I. 1 at 3.)

poration, solicited investments. (D.I. 17 at 44–46.) A "pre-publication" issue of the magazine was prepared and sent to magazine distributors throughout the country, including Delaware (*id.* at 63–64); in that issue, the business address listed for the magazine is that of Kunitz's Delaware attorneys. (*Id.* at 56.) Kunitz testified at his deposition that it was his intention to have inquiries about the magazine forwarded to him from Delaware. (*Id.* at 57.) Not only would Kunitz's magazine-related mail be received at the Delaware address, his answering correspondence would appear to come from there because he had printed and used stationery with the "LOOK" logo and Delaware address. (*Id.* at 58, 60–61.)

In late December, 1982, after its attempts to raise money were consistently frustrated by the legal cloud over its claim to the "LOOK" mark (*id.* at 59–60), LI instituted proceedings before the TTAB to have the registration of LME's marks cancelled.[2] (D.I. 6 at Kunitz Affidavit, p. 4.) Nearly two years later, those proceedings have failed to produce any decision. It has been, as counsel for defendants noted more than once at argument in this Court, a frustrating and unproductive experience.

In May of this year, LME decided "that it could no longer tolerate defendants' infringement of its valuable LOOK trademark," and therefore filed this action. (D.I. 13 at Lehv Affidavit, pp. 13–14.) At roughly the same time, LME filed a motion with the TTAB for suspension of the cancellation proceedings, pending decision in this suit. The defendants moved the TTAB to stay decision on LME's motion until this Court has ruled on the defendants' present motion to dismiss this civil action. (*Id.* at 14.)

**2.** The cancellation proceedings involve only two of LME's three LOOK marks, Reg. Nos. 781,779 and 1,132,175. (D.I. 6 at Kunitz Affidavit, p. 4.) *See supra,* n. 1.

**3.** 28 U.S.C. § 1391(b) reads: "A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law."

## II. LAW

■ The defendants' motion is, in the alternative, asking for either dismissal of the action because venue is improper, or a stay of proceedings until the TTAB has resolved the issue before it. (D.I. 6.) On a motion to dismiss, the facts must, of course, be construed in favor of the non-moving party. *See Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969). Each of the defendants' requests is dealt with in turn. ·

### A. *Venue*

LME argues that its claims arose in this district and that venue is accordingly founded here under 28 U.S.C. § 1391(b).[3] (D.I. 12 at 11.) The Court agrees.

The proper manner for determining where a claim arose has been a matter of some debate. Prior to the Supreme Court's decision in *Leroy v. Great Western United,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), the leading precedent for courts of this circuit considering the issue was *Tefal, S.A. v. Products International Co.,* 529 F.2d 495 (3d Cir.1976). The court in *Tefal* recognized, without making a qualitative judgment about them, that two alternative legal theories had developed in the district courts to deal with venue under 1391(b). In *Honda Associates, Inc. v. Nozawa Trading, Inc.,* 374 F.Supp. 886, 892 (1974), the Southern District of New York applied a test which the Third Circuit characterized as "the 'more than miniscule' test," 529 F.2d at 497, apparently meaning that venue was proper if, among the events giving rise to the claim, a more than miniscule number took place in the district in which venue was asserted to lie.[4] In contrast, however,

In its complaint, LME stated that venue was also proper under § 1391(c), (D.I. 1 at 1–2), but LME has apparently abandoned any plan to argue the propriety of venue on that basis. In its brief it cites and argues only § 1391(b).

**4.** On the assumption that this characterization of the "more than miniscule" test was the one intended by the Third Circuit, that court has been faulted for misreading the test applied by the Southern District of New York in *Honda.* *See* Wepner, "Determining Where the Claim

language in *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 374 F.Supp. 184, 189–90 (D.Del.1974), indicated to the Third Circuit that this Court considered venue to lie in any district in which the claim could be said to have arisen, whether or not that district was the location of most of the claim-creating conduct. 529 F.2d at 497.

New and decisive light was shed on the "claim arose" question by the Supreme Court's *Leroy* opinion. The high court said, "[Congress] restricted venue either to the residence of the defendants or to 'a place which may be more convenient to the litigants'—i.e., both of them—'or to the witnesses who are to testify in the case.'" 443 U.S. at 185, 99 S.Ct. at 2717 (citations omitted). The Court went on to say that it would only be "the unusual case in which it is not clear that the claim arose in only one specific district," *id.*, and that in such a case "a plaintiff may choose between those . . . districts that with approximately equal plausibility . . . may be assigned as the locus of the claim." *Id.* Bearing on all this interpretation is the Court's counsel that

> [s]o long as the plain language of the statute does not open the severe type of "venue gap" that the amendment giving plaintiffs the right to proceed in the district where the claim arose was designed to close, there is no reason to read it more broadly on behalf of plaintiffs.

*Id.* at 184, 99 S.Ct. at 2717 (footnotes omitted).

■ Applying the Supreme Court's guidance to the facts of this case yields the conclusion that venue is proper in this district. This is the judicial district which Kunitz selected as the center for the activities allegedly infringing the plaintiff's trademark. It is the place of incorporation and the business location of the corporate defendant; it is the place to which people interested in the defendants' magazine have their attention directed, both by the address printed at Kunitz's direction in the

pre-publication issue of the magazine and the address printed on the LOOK stationery made for and used by LI; it is the location of agents who acted on behalf of LI to solicit investment in the publishing venture; and it is incidentally the site of one of the magazine distributors solicited to move the magazine into widespread circulation.

Even if the Court were not satisfied that this district is the logical one to tap as the single district in which the claim arose for purposes of § 1391(b), the Court believes that this case could be called one of the unusual variety in which the claim arises in more than one district, one of them being Delaware, and that the plaintiff has properly exercised its option to select this district as the place to litigate its claim.

■ A third and powerful reason for judging venue correct in this jurisdiction is the Supreme Court's counsel to interpret § 1391(b) more broadly in favor of plaintiffs when necessary to avoid a venue gap. *See Leroy, supra,* 443 U.S. at 184, 99 S.Ct. at 2716. Although, again, the Court is satisfied that Delaware is the logical locus to pick as being where the claim arose, it is significant that the potential of a venue gap lurks in this case. In their attempts to dissuade the Court from believing such a potential exists, the defendants have strengthened that belief. They assure the Court there is no venue gap because Kunitz concedes, although it is quite obvious anyway, that venue as to him would lie in Maine. (D.I. 14 at 12.) It is what they fail to say that tells: there is not the slightest indication that LI would concede to venue in Maine. The defendants have made the case for the plaintiff, because if venue as to Kunitz did not lie in this Court and venue as to LI did not lie in Maine, the plaintiff would be faced with the perfect example of a venue gap.

The defendants rely heavily (*id.* at 13) on the following passage from *Leroy* in contending that such a predicament is not the

Arose Under 28 U.S.C. § 1391(b) in Multi-State Trademark Infringement Actions," 72 Trademark Reporter 358, 365–66 (1982).

venue gap counseled against by the Supreme Court:

"The desirability of consolidating similar claims in a single proceeding may lead defendants, such perhaps as the New York and Maryland officials in this case, to waive valid objections to otherwise improper venue. But that concern does not justify reading the statute to give the plaintiff the right to select the place of trial that best suits his convenience.... It is absolutely clear that Congress did not intend to provide for venue at the residence of the plaintiff or to give that party an unfettered choice among a host of different districts.

*Leroy, supra,* 443 U.S. at 184, 185, 99 S.Ct. at 2717. However, the factual situation on which the Supreme Court based its opinion [5] is manifestly different from that before this Court. LME is not trying to bring separate but similar claims against unrelated parties; it is asserting precisely the same claims against two inextricably linked defendants. This is the situation in which venue gaps can open and swallow claims against geographically dispersed defendants, claims which otherwise might prove meritorious. This Court will not allow that to happen.

B. *Stay of Proceedings*

The defendants have requested that, in the event the Court finds, as it has, that venue is proper in this district, the Court nevertheless stay the proceedings in this case. (D.I. 6.) Because the arguments made and the authority cited by the plaintiff in opposing the motion persuade the Court that a stay would be imprudent, the application will be denied.

In *Landis v. North America Co.,* 299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936), the Supreme Court set down the rule that "the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Id.* at 255, 57 S.Ct. at 166. To understand why the proposed stay does indeed pose the possibility of damage to the plaintiff and thus places the defendants under the rule of *Landis,* it is necessary to consider the nature of the substantive issue before the TTAB and the nature of TTAB proceedings.

■ Defendant LI has petitioned the TTAB for the cancellation of the plaintiff's "LOOK" trademark registrations (D.I. 6 at Kunitz Affidavit, p. 4), the sworn and obvious purpose of the petition being to further Kunitz's plan to publish a magazine bearing that trademark. (D.I. 13 at Exhibit 9, Attachment A, p. 4.) Counsel for the defendants represented to the Court at oral argument on the instant motion that the sole issue being pressed in the cancellation proceedings is whether the plaintiff has abandoned and thus lost the right to claim the "LOOK" mark. A statutory definition of abandonment, and the one [6] on which the defendants [7] are apparently relying in the

---

**5.** *Leroy* involved a tender offer for a corporation with ties to Idaho, New York, and Maryland. 443 U.S. at 175–76, 99 S.Ct. at 2712–13. Because of securities laws enacted independently by each of those states, the tender offeror found it more difficult than it liked to pursue the tender offer and attempted to bring state officials into court in the United States District Court for the Northern District of Texas so that they could be enjoined from enforcing their state laws. *Id.* at 177, 99 S.Ct. at 2713. In *Leroy* there is nothing of the concerted action giving rise to a single claim or set of claims against all defendants as there is in this case.

**6.** The alternative definition of abandonment given in the same statute is "[a] course of conduct of the registrant, including acts of omission as

well as commission, [which] causes the mark to lose its significance as an indication of origin." It is hard to imagine the defendants (*see, infra,* n. 7) relying on this definition, however, because it seems the very reason they want to use the LOOK mark is the distinction it retains as a trademark. (*See, e.g.,* D.I. 17 at 65 ("Q: What was your purpose in sending [out to magazine distributors the pre-publication issue of LI's 'LOOK' magazine]? A: To excite the hell out of them, to make them understand that LOOK magazine was coming back ....").)

**7.** Although only one defendant, LI, is a party before the TTAB, for convenience the Court refers to both the defendants in connection with the cancellation proceedings because their inter-

cancellation proceedings (*see* D.I. 6 at Kunitz Affidavit, pp. 3–4), is the discontinuance of a mark's use with the intent of not resuming use. 15 U.S.C. § 1127. In short, the whole of the cancellation proceedings turns on the issue of the plaintiff's intent.

An issue of intent, by its very nature, is one which should generally be resolved by a fact finder that has had the opportunity to see the demeanor of witnesses under direct and cross-examination, to observe firsthand the subtle shifts in tone and behavior that are often decisive in judging the credibility of testimony. As Judge Leahy of this Court put it in another context thirty years ago: "True the paper formalities were practically pat, but the three principal parties were vague, hesitant, and unconvincing when cross-examined as to details. Intent although subjective as a state of mind, is of necessity ascertained from *observable* actions and course of conduct." *Maloney v. Collison*, 119 F.Supp. 12, 15 (D.Del.), *aff'd sub nom.* 218 F.2d 705 (3d Cir.1954) (emphasis added). "Observable" is the operative word, and though seeing is not necessarily believing, it goes a long way toward determining believability.

This notion explains in part the reluctance of courts to grant summary judgment in cases involving questions of intent. *See, e.g., Gifford v. Atchison, Topeka & Santa Fe Ry. Co.*, 685 F.2d 1149, 1156 (9th Cir.1982); *Sterling Nat'l Bank & Trust Co. of N.Y. v. Fidelity Mortgage Investors*, 510 F.2d 870, 875 (2d Cir.1975); *In re Yarn Processing Patent Validity Litigation*, 498 F.2d 271, 288 (5th Cir.), *cert. denied sub nom.* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654 (1974). It also explains this Court's belief that the proceedings of the TTAB should not take precedence over proceedings in this Court. The TTAB's procedures call not for live testimony before a fact finder, but for decision based on the submission of depositions, briefs, documentary evidence, and perhaps oral argument. 37 C.F.R. §§ 2.120(j)(3), 2.125, 2.128, 2.129. Such a process is unlikely to be as accurate a gauge of intent as a full trial, *cf. Capeto-*

ests are identical. (*See* D.I. 13 at Exhibit 9,

*la v. Orlando*, 463 F.Supp. 498, 507 (E.D. Pa.1978) ("a determination [of intent] is best made after a full trial on the merits"), and thus holds the potential of prejudice to the plaintiff.

That being the case, the relevant question is whether the defendants have "ma[d]e out a clear case of hardship or inequity," *Landis, supra*, 299 U.S. at 255, 57 S.Ct. at 166, to justify a stay in this Court. The Court believes they clearly have not. Indeed, at oral argument, counsel for the defendants made much of the protracted proceedings before the TTAB, complaining of the financial burden and frustration of litigation without light at the end of the tunnel. Nevertheless, they argue that the proceedings should go forward there. Attempting to make out a case of inequity, the defendants have listed in one of their briefs the wrongs they feel they've suffered thus far at the hands of the plaintiff. (D.I. 6 at Memorandum, pp. 24–25.) Without running through their protests *seriatim*, suffice it to say that purple prose is no substitute for relevance, and a relevant argument of inequity is nowhere to be found for the defendants.

■ The defendants have raised two additional arguments to justify a stay of proceedings. First, they argue that the doctrine of primary jurisdiction precludes the Court from going forward until after the TTAB has concluded the cancellation proceedings. (D.I. 6 at Memorandum, pp. 18–20.) But the boundaries of that doctrine belie the defendants' interpretation. According to the Supreme Court, primary jurisdiction is "a principle ... that in cases raising issues of fact *not within the conventional experience of judges* or cases requiring administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952) (emphasis added). Questions of intent, such as that in issue in this case, are not beyond the conventional experience of

Attachment A, p. 4.)

judges; they are, on the contrary, a standard fare of the courts and accordingly outside the judicial policy of primary jurisdiction. A doctrine intended to satisfy "the need for an orderly and sensible coordination of the work of agencies and courts," *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 736 (3d Cir.1983), should not be transformed into a woodenly applied commandment. *See Continental Connector Corp. v. Continental Specialties Corp.*, 413 F.Supp. 1347, 1350 (D.Conn. 1976).

Of yet less merit is the defendants' argument that judicial economy will be furthered by staying this case while the TTAB process works to a conclusion. Again, defense counsel's complaints about the seemingly interminable proceedings before the TTAB undermine the defendants' argument. But, beyond that, it is apparent on its face that judicial economy is not served by awaiting one tribunal's resolution of a particular issue when another tribunal can resolve in a single proceeding that issue and all others disputed by the parties. "Congress has provided that all questions in respect to a registered trade-mark may be determined in one proceeding, thus preventing vexatious and harassing litigation as well as saving time, expense and inconvenience to the parties and to the courts and Patent Office Tribunals." *Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp. of America*, 257 F.2d 485, 491 (3d Cir.1958).

III. CONCLUSION

For the foregoing reasons the Court will deny the defendants' motion to dismiss or stay proceedings. An order will be entered in conformance with this opinion.