George F. NOONAN and
Anne Marie Noonan

v.

## COLOUR LIBRARY BOOKS, LTD.

### Civil Action No. 94–11071–RGS.

United States District Court,
D. Massachusetts.

Dec. 6, 1996.

Judith Kemp, Milton, MA, Michael D. Lurie, Alex H. MacDonald, H. Bissell Carey, III, Robinson & Cole, Boston, MA, for George F. Noonan, Ann Marie Noonan.

David R. Friedman, Susan Murphy, Palmer & Dodge, Boston, MA, Robert M. Callagy, Satterlee, Stephens, Burke & Burke, New York City, for Winston Company, R.J. Reynolds Tobacco Company, R.J. Reynolds Tobacco, International, Inc., Lintas: Worldwide, Lintas: Paris, Worldwide Brands, Inc.

Walter H. Mayo, III, Casner & Edwards, Boston, MA, Ralph Gregory Elliot, Tyler, Cooper & Alcorn, Hartford, CT, for Colour Library Books Ltd.

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFFS' MOTION TO ESTABLISH JURISDICTION

STEARNS, District Judge.

This case was previously before the court on a motion to dismiss the Complaint for want of personal jurisdiction. After a hearing, the court dismissed all defendants except Colour Library Books, Ltd. ("CLB"), a United Kingdom corporation with a principal place of business in Surrey, England. The court granted the plaintiffs, George and Anne Noonan, a 120 day period of discovery to develop their jurisdictional claims against CLB. The Noonans now seek a court ruling establishing jurisdiction over CLB on two grounds, that it regularly solicits and conducts business in Massachusetts, and that it derives substantial revenues from the sales

of books "used or consumed" in Massachusetts. The claim is one of general, not specific, jurisdiction.[1] In the alternative, the Noonans ask that the court presume jurisdiction as a sanction for CLB's failure to comply fully with its discovery obligations.

### FACTS

The Amended Complaint is premised upon the 1992 publication in France of an advertisement promoting Winston cigarettes featuring a photograph of the plaintiff, George F. Noonan, a City of Boston mounted patrol officer.[2] Noonan, who had not given permission for the use of his photo, is an ardent opponent of smoking. The offending picture was taken in the spring of 1979 by Neil Sutherland, a CLB staff photographer, while Noonan was in uniform and seated on his horse in front of Faneuil Hall. CLB intended to use the picture in a book entitled *Boston: City of Many Dreams*. The photograph ultimately appeared in another CLB book, *An American Moment*, which was distributed in Europe and the United States.

In March of 1992, CLB sold what it represented as its "rights" to the Noonan photograph to the defendant Lintas: Paris (Lintas). Lintas told CLB that it wanted to use the photograph in a "Winston advertising campaign." Lintas published the picture as part of a full page print advertisement promoting "The Winston Way," an information retrieval service available through an interactive French telephone network (Le Minitel).[3] The ad was aimed exclusively at French consumers, but some three hundred copies of French magazines containing the ad found their way to Massachusetts. Also, a few Massachusetts residents encountered the ad while travelling in France during the summer of 1992. Several of Noonan's acquaintances brought the ad to his attention.[4]

Noonan filed this suit on May 26, 1994, naming CLB, Lintas, and a number of Winston-affiliated tobacco companies as defendants. On September 25, 1995, the court allowed a motion to dismiss for lack of personal jurisdiction as to all defendants, except CLB. The court granted the Noonans' request to allow discovery on the issue of the court's jurisdiction over CLB (and perhaps others).[5] The Noonan's efforts in this regard yield the following additional facts.

Neil Sutherland, the CLB photographer, was in Massachusetts perhaps five times between 1978 and 1994. Sutherland Dep., at 13–14, 42–43. In 1979, Sutherland spent four days in Boston taking photographs for CLB, including the picture of Noonan.[6] Id. at 14–

---

**1.** The Noonans originally claimed specific jurisdiction, a position they have since abandoned for reasons that are apparent in the portrayal of the facts in this opinion and in the court's earlier decision of September 25, 1995.

**2.** In its order on defendants' motion to dismiss the Complaint, the court allowed the plaintiff to file an Amended Complaint adding R.J. Reynolds France, S.A., as a party. The Amended Complaint seeks monetary and injunctive relief against each defendant on claims of (Count I)—misappropriation and violation of the Massachusetts statutory right to privacy (M.G.L. c. 214, § 3A), (Count II)—defamation, (Count III)—common law invasion of privacy, (Count IV)—reckless infliction of emotional distress, and (Count V)—deceptive business practices (M.G.L. c. 93A). Noonan's wife, Anne Marie Noonan, brought a companion claim (Count VI) for loss of consortium.

**3.** Le Minitel provides French subscribers with consumer information transmitted over video screens connected to their telephones. The service is available only in France.

**4.** Some wanted to know whether George Noonan had "sold out" to the tobacco interests. At least

one concerned citizen wrote Noonan an angry letter accusing him of exploiting his uniform to profit from the sale of cigarettes. Although no disciplinary action was taken against Noonan by the Boston Police Department, the association of his image with the promotion and sale of cigarettes has caused him personal embarrassment.

**5.** At the same time the court allowed the Noonans' motion to file an Amended Complaint adding RJR France as a defendant. See *Omni–Wave Electronics Corp. v. Marshall Industries*, 127 F.R.D. 644, 646 (D.Mass.1989). Plaintiffs have offered no additional evidence suggesting that the court has jurisdiction over RJR France.

**6.** At the hearing, the Noonans' counsel noted that Sutherland testified that he did not take all of the Boston pictures featured in *an American Moment* and *Boston: City of Many Dreams*. Counsel draws the inference that other photographers employed by CLB have visited Massachusetts, although there is no evidence to support this. The record reflects that CLB purchases some of its photographs from outside agencies. (Murray Dep., at 23).

15, 27–28, 37–40, 44. On his other four trips, Sutherland passed through Boston on his way elsewhere. Id. at 41–43.

In November of 1993, Derek Murray, then CLB's commercial director, met with plaintiff's counsel in Boston regarding this lawsuit. Murray also met with Danny Gurr, an executive at Lauriat bookstores. Murray Dep., at 64. Murray and Gurr discussed business possibilities over lunch, and later exchanged letters. Nothing of any substance resulted. Id. at 60–63. Sometime in 1993, Murray called Little Brown and Company, a Massachusetts publisher, to solicit business, but was referred to Little Brown's New York office. Id. at 74.

CLB creates, designs and packages books for wholesale distribution. Murray Dep., at 7–8; Noonan App., Ex. 7, at 9. CLB personnel directly solicit business worldwide, including in the United States. Murray Dep., at 35–36, 42. Approximately four months prior to the filing of the Noonan's Complaint in May of 1994, CLB began a business relationship with World Publications, Inc. (WPI), a "remainder house" located in North Dighton, Massachusetts.[7] Press Dep., at 6–8, 17. As a remainder house, WPI purchases overstock which it then sells at a discount to book retailers. Id. at 7–8. The Noonans allege that by May of 1994, CLB had negotiated $600,000 of sales to WPI.[8] Press Dep., at 36; Noonan App., Ex. 9. Because the Noonans' claim of general jurisdiction is based entirely on CLB's dealings with WPI, it is worth reciting the pertinent facts in some detail.

In January or February of 1994, CLB's director of North American sales, Keith Allen–Jones called Jeffrey Press, WPI's President, at WPI's office in North Dighton, Massachusetts. Press Dep., at 17–19. During this conversation, Allen–Jones invited Press and his wife Gail (WPI's Vice–President) to a meeting during the March London Book Fair. Id. at 20–21. On March 18, 1994, Allen–Jones faxed the Presses a list of CLB titles. Noonan App., Ex. 2. On March 22, 1994, the Presses met Allen–Jones in London. They also travelled to CLB's offices in Surrey to meet Barry Austin, CLB's President. Press Dep., at 20–22, 25. During the meeting with Austin, the Presses tentatively agreed to purchase four of CLB's titles. Id. at 21–24. Austin gave the Presses some CLB sample books to take back to Massachusetts. Id. Later in the week, the Presses met with other CLB representatives attending the Book Fair. Press Dep., at 27.

On March 23, 1994, Allen–Jones sent a letter to the Presses confirming WPI's agreement to purchase 125,000 books for a total of $295,550.[9] The books were to be shipped to Massachusetts by CLB. Allen–Jones also offered WPI four other book titles.[10] Noonan App., Ex. 2. On March 30, 1994, WPI returned purchase orders to CLB for 40,000 books totaling $66,500. Noonan App., Ex. 10. On April 1, 1994, Press wrote to Allen–Jones agreeing to the further purchase of 15,000 copies each of twelve titles of the *Cooking in Colour Series* for $225,000, and 15,000 copies of *The Step by Step Cookbook* for $75,000. Noonan App., Ex. 11. Allen–Jones responded with a request that WPI also confirm the purchase of 15,000 copies of *The Good Food Cookbook* for $87,000.[11] Id.

On April 4, 1994, WPI completed and returned CLB's Customer Information Form and a Production & Shipping Details Form. Noonan App., Ex. 9. On April 6, 1994, Jeffrey Press wrote to Allen–Jones regarding

---

**7.** WPI has annual revenues of approximately $20 million. (Noonan App., Ex. 8 at 38.)

**8.** CLB disputes this figure. According to CLB, its first shipment of books to WPI, which arrived in June of 1994, grossed only $52,493.65. See CLB's App., Ex. E and Ex. F.

**9.** Allen–Jones confirmed orders for the following books: 15,000 copies of *The Complete Book of Motorcycles* ($35,250); 10,000 copies of *My Very Own Playhouse* ($12,500); 15,000 copies of *The Christmas Board Book* ($18,750); 25,000 copies

of *The Victorian Cookbook* ($116,250); and 6 titles, 10,000 copies each, of the *Victorian Kitchen Series* ($112,800). Noonan App., Ex. 2.

**10.** *Cooking in Colour Series, The Good Food Cookbook, The Step by Step Cookbook,* and *The Art of Cooking.* Noonan App., Ex. 2.

**11.** According to the evidence offered by CLB, the entire April 1 order was cancelled and a revised purchase order substituted by WPI on August 11, 1994. See CLB's App., Ex. H.

problems with three of the titles and asked that Allen–Jones convey his concerns to Austin. Noonan App., Ex. 12. On April 8, Press and Allen–Jones spoke by telephone. Press Dep., at 56; Noonan App. Ex. 29, at 51. On April 19, 1994, WPI submitted purchase orders in the amount of $300,000 for the *Cooking in Colour Series* and *The Step by Step Cookbook*. Noonan App., Ex. 13. On April. 27 and 28, 1994, CLB and WPI exchanged facsimiles regarding the order. Noonan App., Ex. 14 and Ex. 15.

On May 4, 1994, Gail Press faxed Allen–Jones expressing her displeasure with the format of the exemplar of the *Step by Step Cookbook* provided by CLB. Noonan App., Ex. 16. Allen–Jones responded by fax asking Gail Press to call him.[12] Id. On May 5, 1994, Allen–Jones sent Press a fax (with a copy to Austin) confirming WPI's purchase orders for 305,000 books at a cost of $520,-550. Noonan App., Ex. 18. These books were eventually delivered to Massachusetts and paid for by WPI. Press Dep., at 27–32, 44, 54. Allen–Jones also told the Presses that he had new samples to show them at an upcoming U.S. booksellers' show. Id. at 51.

On May 11, 1994, Allen–Jones sent a facsimile to WPI discussing *The Step-by-Step Cookbook* and a new title, *Classic Motorcycles*. Noonan App., Ex. 3. On May 15, 1994, CLB sent WPI a $33,743.65 invoice for the motorcycle books. Noonan App., Ex. 19.[13] On May 17, 1994, Allen–Jones sent some additional sample books to WPI and solicited orders for 10 additional titles. Noonan App., Ex. 20.

On May 19, 1994, Allen–Jones sent a copy of *The Astrology Yearbook* to WPI and solicited an order for 12,000 copies in the amount of $30,000. Noonan App., Ex. 21. WPI ordered and received these books. Press Dep., at 53–54. Between March 1, 1994, and May 26, 1994, Allen–Jones met at least twice with the Presses at WPI in Massachusetts on

CLB business. Id. at 47. To sum up this somewhat complicated history, by May 26, 1994, WPI had placed orders for $584,293.65 of various CLB titles, of which none had been delivered, although $52,493.65 worth of CLB books were on a boat to North Dighton.

## LEGAL STANDARDS

 When considering a motion to dismiss, the court accepts the facts alleged in the Amended Complaint as true and views any reasonable inference implicit in the pleadings in the light most flattering to the nonmoving party. See *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir. 1989). To make out a prima facie showing of *in personam* jurisdiction, however, a plaintiff's reliance on the bare allegations of the Amended Complaint is not enough. *Chlebda v. H.E. Fortna & Bro., Inc.*, 609 F.2d 1022, 1024 (1st Cir.1979). "The *prima facie* showing of personal jurisdiction must be based on evidence of specific facts set forth in the record. The 'plaintiff must go beyond the pleadings and make affirmative proof.'" *Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir.1992) (quoting *Chlebda*, 609 F.2d at 1024). In determining whether a *prima facie* showing has been made, the court "accepts properly supported proffers of evidence by a plaintiff as true." *Boit*, 967 F.2d at 675 (citations omitted).[14]

*In personam* jurisdiction takes two forms, general and specific. "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *United Elec. Workers v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1088 (1st Cir.1992). "Specific personal jurisdiction, by contrast, is narrower in scope and may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendant's fo-

---

**12.** Allen–Jones copied this letter to "BA, GH, BD," presumably Barry Austin, Bill Dancer, CLB's production director, and Gerald Hughes, a member of its board of directors. Noonan App., Ex. 16; Murray Dep., at 87.

**13.** The books were scheduled to arrive in Boston on May 25, 1994. Id.

**14.** Here the record is better developed than most, the plaintiffs having been authorized to conduct discovery in support of their jurisdictional claim.

rum-based contacts.'" *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir.1994) (quoting *United Elec. Workers,* 960 F.2d at 1088–1089).

■ When jurisdiction is grounded on diversity of citizenship, a federal court applies the law of the forum state to resolve any dispute. *Gray v. O'Brien,* 777 F.2d 864, 866 (1st Cir.1985). Under Massachusetts law, a plaintiff seeking to establish personal jurisdiction has a twofold burden. A plaintiff must first demonstrate that the Massachusetts Long–Arm Statute, G.L. c. 223A, authorizes jurisdiction over the defendant, and second, that any such exercise comports with the Due Process Clause of the Fourteenth Amendment. *Good Hope Industries, Inc. v. Ryder Scott Co.,* 378 Mass. 1, 5–6, 389 N.E.2d 76 (1979).[15] Section 3(d) of the Long–Arm Statute permits general jurisdiction to be asserted where a defendant causes "tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth." [16]

A finding of personal jurisdiction will not offend due process when "contacts [with the forum] proximately result from actions by the defendant *himself* that create a substantial connection with the forum State.... [The] 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985) (internal quotation marks and citations omitted, emphasis in original). In other words, a party not physically present in the forum state cannot be said to fall within a forum state's personal jurisdiction unless his "connection with the forum State [is] such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (citations omitted).

■ Even where the formal criteria for jurisdiction are met, a court can consider so-called "Gestalt factors" in determining whether an assertion of jurisdiction imposes "some kind of special or unusual burden" on a defendant. *Pritzker,* 42 F.3d at 64. See also *Donatelli v. National Hockey League,* 893 F.2d 459, 465 (1st Cir.1990). The Gestalt factors "include: (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interest of all sovereigns in promoting substantive social policies." *United Elec. Workers v. 163 Pleasant Street Corp.,* 987 F.2d 39, 46 (1st Cir.1993). The factors are, however, to be weighed with healthy deference to the plaintiff's choice of a forum. *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 151 (1st Cir.1995).

■ Despite the plethora of legal standards, whether a court possesses jurisdiction over a party is, at bottom, very much decided by the specific facts of the case. See *United Elec. Workers,* 960 F.2d at 1089; *Great Western United Corp. v. Kidwell,* 577 F.2d 1256, 1267 (5th Cir.1978), *rev'd on other grounds,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979); *Good Hope Industries,* 378 Mass. at 2, 389 N.E.2d 76.

With these principles in mind, I turn to a more thorough examination of general jurisdiction, the theory upon which the Noonans rely. For present purposes, I assume that George Noonan endured a tortious injury in Massachusetts stemming either from CLB's sale of his photograph to Lintas: Paris, or as is more likely, from Lintas's publication of his photograph as part of its Winston cigarette campaign. But see *Cunningham v. Ardrox, Inc.,* 40 Mass.App.Ct. 279, 282, 663

---

**15.** When a plaintiff is clearly unable to establish jurisdiction under state law, it is the better practice to end the inquiry without addressing constitutional concerns. See *Ticketmaster—New York, Inc. v. Alioto,* 26 F.3d 201, 205 (1st Cir.1994).

**16.** The Noonans base their claim of general jurisdiction on the first and third of these disjunctive predicates.

N.E.2d 577 (1996) (a plaintiff must show an actual injury in Massachusetts, not merely that he suffered in Massachusetts from the "manifestations, effects and consequences" of an extraterritorial tort).

■ General jurisdiction can be established by a showing of "continuous and systematic activity" by a defendant in the forum state. *Connecticut Nat'l Bank v. Hoover Treated Wood Prod., Inc.*, 37 Mass.App.Ct. 231, 233–234 n. 6, 638 N.E.2d 942 (1994). The signal question is the degree of entanglement by a defendant with the forum state that must be shown to snap shut the jaw of general jurisdiction. Clearly the minimal contacts that suffice to establish specific jurisdiction will not satisfy a plaintiff's burden or else the two distinct theories of jurisdiction become conflated into one. General jurisdiction is necessarily "more demanding." *Heins v. Wilhelm Loh Wetzlar Optical Machinery GmbH & Co. KG*, 26 Mass.App.Ct. 14, 22 n. 6, 522 N.E.2d 989 (1988). See also *Keeton v. Hustler Magazine*, 465 U.S. 770, 779, 104 S.Ct. 1473, 1480–81, 79 L.Ed.2d 790 (1984) (circulation of 15,000 magazines importing an alleged libel into the forum state held insufficient to establish general jurisdiction). The seminal case is *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In *Helicopteros*, plaintiffs brought suit in Texas against Helicol, a Columbian corporation, on behalf of four United States citizens killed in the crash of a Helicol helicopter in Peru. The extent of Helicol's seven years of contacts with Texas was summarized by the Supreme Court as follows.

> Basically, Helicol's contacts with Texas consisted of sending its chief executive officer to Houston for a contract negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from Bell Helicopter for substantial sums; and sending personnel to Bell's facilities in Fort Worth for training.

Id. at 416, 104 S.Ct. at 1873.[17]

The sum of this activity, the Court concluded, did not amount to "the kind of continuous and systematic general business contacts" required by the Due Process Clause to establish general jurisdiction. Id. at 416, 418–419, 104 S.Ct. at 1873, 1874–75. In another important case, *International Shoe Co. v. State of Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 159–60, 90 L.Ed. 95 (1945), the Court, addressing due process in the context of specific jurisdiction, cautioned that it is "the quality and nature of the activity," rather than any mechanical test, that defines the height of the due process threshold. The Court also observed that,

> ... to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

Id.

Massachusetts case law is sparse in its discussion of general jurisdiction and for the most part simply alludes to the authority and language of *Helicopteros*. In what is perhaps its most significant modern jurisdiction case, *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 625 N.E.2d 549 (1994), the Supreme Judicial Court found specific jurisdiction over a California hotel based on the hotel's regular and direct solicitation of guests in Massachusetts. The Court also, however, noted that the defendant's activities in Massachusetts, while spanning several years, "[did] not approach the volume required for an assertion of general jurisdiction." Id. 625 N.E.2d at 554 n. 6. In *Nowak v. Tak How Investment, Ltd.*, 899 F.Supp. 25, 30 (D.Mass.1995), aff'd, 94 F.3d 708 (1st Cir.1996), the federal

---

**17.** The Court also noted that Helicol had purchased approximately 80% of its air fleet in Texas, had conducted negotiations in Texas over the contract in the performance of which the decedents were killed, and had hired the decedents in Texas. *Helicopteros*, 466 U.S. at 410–412, 104 S.Ct. at 1870–71.

district court reached a similar conclusion in a factually similar case. Also instructive is *United Elec. Workers*, 960 F.2d at 1088, where the First Circuit held "manifestly insufficient" for general jurisdiction the facts that a Scottish corporation wholly owned its offending Massachusetts subsidiary, appointed the company's directors, paid its officers, and invested some $8 million in its operations.

A principal concern of due process, emphasized in *World–Wide Volkswagen v. Woodson*, 444 U.S. 286 (1980), is "foreseeability," that is, the extent to which a reasonable defendant by its conduct and connections with the forum state would anticipate having to answer to its courts for any allegation of wrongdoing. Id. at 297. See also *Donatelli*, 893 F.2d at 464. In this case, the Noonans' proofs involve contacts between CLB and Massachusetts that occurred some two years *after* the alleged tortious injury (however defined) to George Noonan. Is a foreign corporation's contact with the forum to be measured at the time of the alleged tort (as defendant prays), at the time the Complaint is filed (as the court held for purposes of discovery), or at any time (as plaintiffs advocate)?

■ No Massachusetts case I am aware of discusses general jurisdiction in a context that gives a direct answer to this question, although to the extent that foreseeability is a touchstone of due process logic would measure general jurisdiction as of the date the tortious act is committed. Cf. *Petro Serv. Holdings v. Mobil Exploration & Prod.*, 680 F.Supp. 492, 495–496 (D.R.I.1988). Foreseeability in hindsight is after all an oxymoron. Cf. *United States v. O'Campo*, 973 F.2d 1015, 1021, 1024 (1st Cir.1992).[18] The issue need not, however, be definitively resolved as I conclude that by any measure, the Noonans have failed to make out a prima facie case of general jurisdiction.[19]

CLB's first meaningful contact with Massachusetts, a telephone call to WPI in January or February of 1994, occurred some two years after it had sold George Noonan's photograph to Lintas, and only four months prior to the filing of the Noonans' Complaint.[20] CLB's first shipment of books to WPI, which arrived in Massachusetts in June of 1994 (the Complaint was filed in May) amounted to only $52,493.65. CLB's worldwide sales for 1994 by contrast amounted to $39,000,000. Any further book orders by WPI were not finalized or received until the summer or fall of 1994. Assuming that the Noonans' best case falls under the "substantial revenues" test of § 3(d), a $52,000 sale of books, (or even a $500,000 sale), whether measured by a qualitative or a quantitative test, is simply insufficient to establish general jurisdiction. Compare *Heins*, supra, at 20–21 & n. 5, 522 N.E.2d 989 (defendant sold "dozens" of expensive optical machines, at a cost per machine of $56,000, to the company where plaintiff worked and "many others" to similar companies in Massachusetts). Cf. *Telco Communications, Inc. v. New Jersey State Firemen's Mut. Benev. Ass'n*, 41 Mass.App. Ct. 225, 230–232, 669 N.E.2d 781 (1996). Finally, there is no evidence in the record that the books CLB sold to WPI were "used or consumed" in Massachusetts as the "substantial revenue" branch of § 3(d) requires. Indeed, given the specialized nature of the

**18.** Three federal district courts have considered the defendant's volume of sales for the year in which the Complaint was filed in determining the existence of general jurisdiction. See *American Home Assurance Co. v. Sport Maska, Inc.*, 808 F.Supp. 67, 71 (D.Mass.1992); *Kolikof v. Samuelson*, 488 F.Supp. 881 (D.Mass.1980); *Mark v. Obear & Sons, Inc.*, 313 F.Supp. 373 (D.Mass.1970). In each of these cases, however, the defendant's presence in Massachusetts had been established prior to the time the alleged tort occurred.

**19.** Plaintiffs object that this conclusion immunizes the tortious defendant who lays back from the forum state, commits a harm against a plaintiff, and then rushes in to the forum to mine gold. First, it does not immunize the defendant, it merely requires the plaintiff to sue the defendant in another (perhaps less convenient) forum. Second, in the real world, it is inconceivable that a business would forestall entry into a potentially lucrative market simply to defend a tort on its home ground.

**20.** The first contact between CLB and WPI occurred in October, 1992, although no business came about as a result. CLB App., Ex. I and J.

titles WPI purchased it is highly unlikely that all, or even many, were.[21]

## ORDER

For the foregoing reasons plaintiffs' Motion to Establish Jurisdiction is *DENIED*, and the case will be *DISMISSED*.

SO ORDERED.

---

**21.** I do not set out the numerous facts that the Noonans offer in support of their request that the court impose jurisdiction over CLB as a sanction for its failure to adequately respond to discovery as I am not persuaded that CLB's acts in that regard warrant sanctions. CLB is not in contempt of the court's February 8, 1996 Order, as plaintiffs contend. See *Insurance Corp. v. Compagnie des Bauxites*, 456 U.S. 694, 707–708, 102 S.Ct. 2099, 2106–07, 72 L.Ed.2d 492 (1982). In the February 8 Order, the court allowed plaintiffs' motion to compel only as to Requests # 1, # 5, # 8, # 9, and # 12 and, except as to # 12, limited the relevant period from 1976 until the time the Complaint was filed. The requests sought production of documents relating to CLB's business contacts with Massachusetts.

CLB responded to those requests with the documents it acknowledged possessing. CLB's counsel repeated that representation to the court at the jurisdictional hearing. While plaintiffs claim that WPI has produced documents that CLB should have produced, WPI's production of these documents does not prove that CLB's response was misleading.

Regarding the Noonans' Rule 30(b)(6) deposition notice to CLB, Attorney Elliot stated that CLB offered several alternatives. Plaintiffs' counsel rejected some of the proposed deponents and made no election regarding the others. Notably, there is no evidence, nor do the Noonans claim that any exists, that CLB did business with any Massachusetts corporation other than WPI.